# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BRANDON SMIETANA and | ) | |
| SKYCOIN GLOBAL FOUNDATION LIMITED, | ) | |
| a Singapore company, and SYMBOLIC | ) | |
| ANALYTICS INC.    a Delaware Corporation | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:22-cv-00708 |
| | ) | |
| v. | ) | |
| | ) | Honorable Sara L. Ellis |
| BRADFORD STEPHENS, | ) | |
| AARON KUNSTMAN, | ) | |
| HARRISON GEVIRTZ, f/k/a "HaRRo", | ) | **JURY DEMANDED** |
| RYAN EAGLE, ADAM YOUNG, | ) | |
| FAR AHEAD MARKETING, LLC., | ) | |
| JOEL WAYNE CUTHRIELL f/k/a "JOEL", | ) | |
| MORGEN PECK, TRISTAN GREENE, | ) | |
| BRYAN CLARK, CATHERINE BYERLY, | ) | |
| STEVEN LEONARD, JOSHUA OGLE, | ) | |
| CONDÉ NAST d/b/a THE NEW YORKER, | ) | |
| THE NEW YORKER, and | ) | |
| UNKNOWN INDIVIDUALS AND COMPANIES | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED COMPLAINT AT LAW

NOW COME Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL

FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a

Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C.

Goode, for their Complaint against Defendants, Bradford Stephens, Aaron Kunstman, Harrison

Gevirtz f/k/a "HaRRo", Ryan Eagle, Adam Young, Far Ahead Marketing, LLC., Joel Wayne

Cuthriell f/k/a "JOEL", f/k/a "Caribou", Morgen Peck, Tristan Greene, Bryan Clark, Catherine

Byerly, Steven Leonard, Joshua Ogle, Condé Nast d/b/a The New Yorker, The New Yorker, and *UNKNOWN INDIVIDUALS AND COMPANIES,* states as follows:

## PARTIES

1.      SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company ("Skycoin"), is a consortium of related entities involved in the development of software, hardware, design, manufacturing and services operating under the consumer brand name "Skycoin", which includes Skycoin Global Foundation, a Singapore Company ("SGF"), Skycoin Foundation, a Singapore Company ("SF"), Symbolic Analytics Inc., a Delaware Corporation ("SA"), Shellpay China, a Chinese Company, as well as other entities that are responsible for regional operations or management of specific aspects of Skycoin's global operations.

2.      Skycoin created 100 million Skycoin Tokens during its launch in 2013, which were distributed and traded on various exchanges by 2017.

3.      The peak market capitalization of all existing Skycoin Tokens reached $5 Billion U.S. Dollars in January 2018.

4.      Defendants Bradford Stephens ("Stephens") and Harrison Gevirtz ("Gevirtz"), recognizing the success of Skycoin, devised a plan and scheme to defraud, extort and steal money and assets from Skycoin in concert with some or all of the other named Defendants in this Complaint.

5.      Plaintiff Skycoin Global Foundation Limited (hereinafter "Skycoin") is a private company organized under the laws of Singapore, having a principal place of business located at 2 Venture Drive, #11-31, Vision Exchange, Singapore.

6.     Plaintiff Symbolic Analytics (hereinafter "SA") is a private company organized under the laws of Delaware in the United States.

7.     Plaintiff Brandon Smietana ( hereinafter "Smietana" or "Synth"), is an individual citizen of the United States of America who is the Chief Software Architect and authorized representative of Skycoin Global Foundation and Symbolic Analytics.

8.     Defendant Bradford Stephens (hereinafter "Stephens"), is an individual citizen of the State of Illinois, U.S.A and residing in the City of Chicago.

9.     Defendant Ryan Eagle (hereinafter "Eagle"), is an individual citizen of the State of Illinois, U.S.A. and residing in Buffalo Grove.

10.     Defendant Harrison Gevirtz (hereinafter "Gevirtz" or HaRRo) is an individual citizen of either the State of New York or the State of California in the U.S.A.

11.     On information and belief, at all relevant times herein, Gevirtz has been the super administrator and/or owner of *blackhatsworld.com*, a hacking website. Gevirtz is involved in all activities of Stephens, by Stephens own admission.

12.     Defendant Adam Young (hereinafter "Young"), is an individual citizen of the State of New York in the U.S.A. and is believed to be residing therein.

13.     Defendant Joshua Ogle (hereinafter "Ogle"), is an individual citizen of the State of New York.  On information and belief, Ogle is the owner of Far Ahead Marketing.

14.     Defendant  Steven Leonard (hereinafter "Leonard"), is an individual citizen of the State of New York who maintains his residence in the State of Florida. Pursuant to Fed. R. Civ. P. 11(b)(3), the factual contentions in this paragraph have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or during discovery.

15.     On information and belief, Defendant Joel Wayne Cuthriell f/k/a "JOEL", f/k/a "Caribou" ( hereinafter "Cuthriell"), is an individual citizen of the State of Oklahoma.

16.     Defendant Far Ahead Marketing, LLC ( hereinafter "FAM") is a Wyoming Limited Liability Company but maintains its  principal place of business in New York, New York.

17.     On information and belief, at all relevant times herein, FAM has been owned and/or controlled by Joshua Ogle.

18.     Defendant Aaron Kunstman,( hereinafter "Kunstman"), is an individual citizen of the State of Wisconsin who is residing in the City of Milwaukee.

19.     "Sudo" is a network of similarly named Telegram accounts, operated by a minimum of four persons. At least one of these persons is known to be Kunstman. Bradford Stephens is widely believed to also be one of the account operators. The other two or more operators are currently unknown.

20.     Defendant Eagle Web Assets, Inc. ( hereinafter "EWA") is an Illinois corporation with its principal place of business in Cook County, Illinois and was involuntarily dissolved on August 9, 2013.

21.     On information and belief, despite being dissolved, Eagle and/or Gevirtz continued doing business as EWA.

22.     At all relevant times herein, Eagle continued to serve as registered agent for EWA, and EWA maintained a registered office, in Cook County, Illinois.

23.     At all relevant times, Defendant Eagle was the founder, President, Secretary and a Director of EWA.

24.     On information and belief, at all relevant times, EWA has been owned and/or controlled by Defendants Eagle and/or Gevirtz.

25.     Defendant Catherine Byerly (hereinafter "Byerly") is a resident of Florida.

26.     Defendant Tristian Greene (hereinafter "Greene") is a privately paid freelance journalist and is a resident of Chicago.

27.     Defendant Bryan Clarke (hereinafter "Clarke") is a privately paid freelance journalist and is a resident of New York.

28.     Defendant Morgen Peck (hereinafter "Peck") is a privately paid freelance journalist and a resident of New York.

29.     Defendant Condé Nast is a global mass media company in the business of producing world leading print, digital, video and social media brands organized under the laws of the state of New York.

30.     Defendant The New Yorker is a prominent American weekly magazine owned and operated by Defendant Condé Nast.

31.     On August 28, 2021, Peck published an article in The New Yorker titled *Pumpers, Dumpers, and Shills: The Skycoin Saga.* The article can be found on https://www.newyorker.com/tech/annals-of-technology/pumpers-dumpers-and-shills-the-skycoin-saga (Exhibit A)

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) since the district courts have original jurisdiction of all civil actions arising under the laws of the United States and Plaintiff has asserted a claim under federal law, 18 U.S.C. § 1964 (RICO).

33.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1), 1332(a)(2) and 1332(a)(3) given that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and in addition thereto, this civil action is between (a) citizens of different States (28 U.S.C. § 1332(a)(1)),(b) citizens of a State and a citizen or subject of a foreign state who are not domiciled in the same state (29 U.S.C. § 1332(a)(2)), and/or (c) citizens of different States and in which a citizen or subject of a foreign state is an additional party (28 U.S.C. § 1332(a)(3)).

34.     This Court has subject matter jurisdiction over this matter pursuant to Plaintiff's federal trade secret claim pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§1836-39 et seq., and 28 U.S.C. §1331 and §1343.

35.     This Court may exercise supplemental subject matter jurisdiction over Count II through Count VI and Count VIII through Count XIII pursuant to 28 U.S.C. §§ 1367 because the claims arise out of the same core or nucleus of operative fact as the other claims and are so related to those claims that they form part of the same case or controversy.  The Plaintiffs also have a common interest in one or more of the claims.

36.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) because several of the Defendants reside in the Northern District of Illinois, and pursuant to 28 U.S.C. § 1391(b)(2) considering that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in said district.

37.     Venue is likewise proper in this judicial district pursuant to 18 U.S.C. § 1965. Section 1965(b) of RICO provides that process may be served in "any judicial district of the United States" when required by the "ends of justice" and courts have held that such "nationwide service of process" provisions also confer personal jurisdiction over a defendant in any judicial

district as long as the defendant has minimum contacts with the United States. The Defendants have minimum contacts with the State of Illinois and the United States.

## FACTS COMMON TO ALL COUNTS

38.     On or about January 8, 2018, Plaintiffs entered into discussions with Defendant Stephens and Defendant Gevirtz to develop, launch and manage a comprehensive marketing and brand awareness program for Skycoin, including, but not limited to, revamping the Skycoin website, performing search engine optimization services ("SEO") and generating positive publicity for Skycoin (the "Marketing Program").

39.     On or about January 8, 2018, Stephens represented himself to be the owner of Smolder LLC, a marketing startup company and the company to whom the payments would be made.

40.     Unbeknownst to Plaintiffs, Defendants Stephens and Gevirtz were prohibited from engaging in activities such as the Marketing Program pursuant to an FTC Order (*Federal Trade Commission v. CPA TANK, INC., VITO GLAZERS, EAGLE WEB ASSETS INC., and RYAN EAGLE*, Case No: 14-cv-1239 dated February 19, 2014).

41.     At all relevant times herein, Defendants were aware of the fact that, under this Order, payments could not be made to them for marketing activities.

42.     Defendants, Stephens and Gevirtz, failed to inform Plaintiffs of the existence of that Order, and violated that Order by offering to provide marketing services to Plaintiffs.

43.     If Plaintiffs had known about the existence of the FTC Order and/or Defendants had not lied and concealed the FTC Order, Plaintiffs would not have entered into the Agreement with Stephens and Gevirtz.

44.     Plaintiffs reached an agreement with Stephens and Gevirtz to implement the Marketing Program, and as part and parcel of that agreement, paid Bradford and Gevirtz $107,948.00 ($66,258.00 in the form of four (4) Bitcoins and $41,690.00 in the form of 1,100 Skycoin) (the "Initial Payment"). This Initial Payment included an expense budget for an upcoming industry conference in Las Vegas, Nevada.  There was an explicit agreement that any expense in excess of $1,000.00 would require prior approval from Skycoin.

45.     In addition to the aforementioned payments, Plaintiffs paid approximately $800,000.00 in Skycoin Tokens to Defendants Stephens and Gevirtz for an internet advertising campaign.

46.     Shortly after the Initial Payment, Stephens submitted two additional invoices for certain work allegedly performed by Byerly totaling approximately $14,752.44 dollars (the "Byerly Payment").

47.     On or about January 12, 2018, Stephens and Defendant Byerly notified Plaintiffs of a potential crisis they discovered that would critically impact Skycoin's business, marketing, and internet presence.  As represented by Stephens and Byerly, an unknown third party was presumably targeting Sycoin by linking pornographic blogs and other harmful spam content to Skycoin's website.  Linking this undesired content to Skycoin's website would function to decrease Skycoin's website's ranking precipitously in search engines and irrevocably destroy Skycoin's image, reputation and internet presence.

48.     In order to combat the internet assault by these third parties, Stephens and Gevirtz indicated that an additional $38,000.00 would be required.

49.     On or about January 14, 2018 and January 19, 2018, Skycoin paid Stephens and Gevirtz $38,000.00 to combat the internet assault as was requested.

50.     In early February of 2018, Skycoin learned that in actuality, there was no third party.  Setphens and Gevirtz actually instigated the attack themselves as a fraudulent means to extract additional funds from Skycoin. The invoices submitted by Stephens and Gevirtz were fabricated. Gevirtz's and Stephens' attack on the Skycoin website damaged Skycoin's search engine optimization (SEO) ranking and effectively significantly reduced internet traffic to Plaintiff's website.

51.     As part of the Marketing Program, Skycoin made the following payments to Stephens and Gevirtz during January of 2018:

a.   On January 11, 2018. $842,400.00 in the form of 20,000 Skycoin Tokens for the Marketing Program budget;

b.   On January 13, 2018, $14,314.00 in the form of one (1) Bitcoin as a budget for a conference in Miami, Florida;

c.   On January 16, 2018, $121,337.00 in the form of 3,899 Skycoin Tokens as part of the Marketing Program budget; and

d.   On January 18, 2018, $23,212.00 in the form of two (2) Bitcoins and $80,929.00 in the form of 2,625 Skycoin Tokens for labor cost to Stephens and Gevirtz for their employees performing work on the Marketing Program.

e.   On January 19, 2018, $56,457 in the form of four (4) Bitcoins and $14,679 in the form of 1.30 Bitcoin in two separate payments, for the Marketing Program and to fight off the attacks by third parties on Skycoin's website.  These services were never performed.

52.     In late January to early February of 2018, Stephens demanded that Skycoin pay $100,000.00 per month to ward off the third party SEO attacks on Skycoin's website.  Stephens later increased this $100,000.00 per month demand to $300,000.00 per month in order to quell the attacks.

53.     In early February of 2018, Symbolic Analytics had received deficient invoices which were highly suggestive of fraud.  Upon determining that there may be fraud involved in Defendants' billings, Plaintiffs discontinued all additional payments.

54.     On or about February 8, 2018, Gevirtz made statements to Skycoin's IT staff suggesting that he controlled the computers performing the SEO attacks and that they could be stopped and the links damaging Skycoin's website could be removed if the Plaintiffs paid them the money demanded.

55.     Gevirtz made statements to Skycoin's IT staff suggesting that he controlled the computers performing the SEO attacks and that they could be stopped and the links damaging Skycoin's website could be removed if the Plaintiffs paid them the money demanded.

56.     Plaintiffs did not pay these amounts demanded by Stephens.

## DEFENDANTS' EXTORTION

57.     Upon refusal by Skycoin to pay Stephens the monthly payments requested, in or around February of 2018, Stephens and Gevirtz met Smietana in Shanghai, China, and in association with Eagle, who was participating by Zoom, threatened to have Skycoin delisted from all exchanges including, for example, Bittrex and Binance, unless Smietana agreed to pay them $30,000,000.00 in Bitcoin and $1,000,000.00 in U.S. Dollars.

58.     Defendants' threats included statements that failure to comply would result in Skycoin's destruction and the price of Skycoin being driven to zero.

59.     Stephens and Gevirtz demanded that Stephens be made COO and be put in control of management of the company.

60.     Defendants further demanded that Plaintiffs make Gevirtz CFO and put him in charge of all company accounts in order to create a new company controlled by Gevirtz and Stephens and transfer all assets over to the new company.

61.     Smietana, in fear of Stephens's and Gevirtz's threats of financial destabilization of Skycoin, capitulated to their demands, and initiated the first of three (3) extortion payments on or about February 9, 2018, in the amount of $127,000.00 (the "Extortion Payments").

62.     Added factors contributing to Smietana's agreement to pay the Extortion Payments were Gevirtz's allusions to connections to organized crime cartels in Eastern Europe that would employ "unconventional debt collection" methods should Smietana not accede to their demands.

63.     On or about February 22, 2018, Stephens ended his Marketing Program engagement with Plaintiffs under pressure from Skycoin's advisory board because of his association with Gevirtz and the discovery of the fraudulent invoicing and business practices.

64.     Plaintiffs requested a refund of the unspent prepayments made for the Marketing Program, however, Stephens and Gevirtz refused to return any of said money.

65.     In and around the time Stephens and Gevirtz demanded the Extortion Payments from Smietana, they also attempted to hostilely seize control of Skycoin.  Specifically, Stephens and Gevirtz threatened to orchestrate the publication of a series of negative and damaging articles through various print and online media sources unless Smietana made Stephens COO of Skycoin and put Gevirtz in charge of payroll and accounting. Effectively, a plot to allow Stephens and Gevirtz to take over the company and its assets.

66.     In furtherance of this conspiracy and plan to take over Skycoin, Stephens paid journalist Tristian Greene ("Greene") to write and publish the article entitled "Skycoin: Anatomy of a cryptocurrency scam," February 15, 2018 - 10:47 pm UTC

(https://thenextweb.com/news/anatomy-of-a-cryptocurrency-scam-in-the-wild) under an anonymous name.

67.   This negative article caused severe damage to the price of Skycoin Tokens and to Skycoin's reputation. Stephens openly admitted that he was responsible for paying the journalist to publish the article, but went to Skycoin's investors and claimed that Smietana had ordered him to have a negative article published to intentionally destroy the price of Skycoin Token. Stephens attempted to organize a management and investor revolt, to transfer control of the company to Stephens and Gevirtz, under the pretense that actions Stephens had performed were in fact performed by Smietana.

68.   Greene later cited that same article in another negative Skycoin article on "The Next Web" on "Exclusive: We suspected this shady cryptocurrency project was a scam. Now we're sure of it." Published March 8, 2018 - 3:22 am UTC,

(https://thenextweb.com/news/exclusive-we-suspected-this-shady-cryptocurrency-project-was-a-scam-now-were-sure-of-it).

69.   A key part of Skycoin's business plan was to be listed on the Bittrex Exchange. The Bittrex Exchange is a world-wide trading platform that facilitates real-time order execution of crypto currencies, such as Skycoin.

70.   Skycoin devoted significant resources to obtain a Bittrex listing, which had been negotiated through a third party.

71.   Knowing that Skycoin was about to obtain a Bittrex listing, on or about February 25, 2018, Stephens threatened Smietana that unless Smietana paid Gevirtz, Young, Eagle, and Stephens, he would approach Bittrex and purposely interfere with Skycoin's third-party relationships to prevent Skycoin from being listed on Bittrex.

72.     Smietana refused to pay the money demanded by Stephens, and Stephens did, in fact, provide untrue information to Bittrex which ultimately led to the spread of false rumors regarding Skycoin and Skycoin not being listed on the Bittrex Exchange.

73.     Between February 26, 2018 through March 9, 2018, Stephens, Gevirtz and Byerly stole access to Skycoin's media accounts, including but not limited to, Skycoin's Shopify store, Twitter account, Linkedin account, Slack channel account, and accounts associated with the operation of Skycoin's website. These media accounts were an integral and necessary component of Skycoin's business.

74.     On or about October 18, 2018, Stephens and Gevirtz demanded over $150,000.00 for return of Skycoin's stolen computer-based assets and media accounts.

75.     On or about May 24, 2018, Binace announced that it would list Skycoin on its exchange.  Binance holds itself out as the "world's largest crypto exchange" and is a trading platform where customers can buy and sell cryptocurrencies. It is highly desirable for cryptocurrencies to be listed on the Binance exchange.

76.     On or about June 12, 2018, when Smietana refused to succumb to Stephens' extortion demands, Stephens, Gevirtz, and Eagle conspired with Yan Xiandong, Li Min, Sam Sing Fond and Sun Fei (hereinafter collectively referred to as the "Assailants") in a plot to kidnap Smietana and his girlfriend, and steal $30,000,000.00 that Stephens claimed he was due from Skycoin.

77.     In furtherance of the conspiracy, the Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of bussiness, and cryptocurrency wallets.

78.     Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin with a market value of $81,018.98, totalling $220,179.31.

79.     During the siege and home invasion, the Assailants called Stephens and complained that they did not find the thousands of Bitcoin promised to them.

**DEFENDANTS' THEFT OF ACCOUNTS**

80.     Prior to Stephens' separation from Skycoin, upon notice of his departure, the company made a list of all accounts to which Stephens had authorized access and thereinafter terminated his access to those accounts.

81.     Skycoin staff contacted Stephens requesting that he return all company assets andcompany accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

82.     Symbolic Analytics staff and members of Skycoin contacted Stephens requesting that he return all company assets and company accounts, and to provide accounting statements of expenditures so that Plaintiffs could calculate how much unspent money was due to the company.

83.     Stephens acknowledged that there were unspent funds due back to Plaintiffs, however, instead of returning the money due, Stephens hacked into the various company accounts and began to engage in a series of extortion and fraudulent acts against Skycoin.

84.     Stephens, Gevirtz, and Byerly changed the passwords to some of the company accounts, locked Skycoin and Symbolic Analytics out of them, and then attempted to extort the Company for an additional $150,000.00.  In addition, Stephens and Gevirtz refused to return the unspent money that was prepaid and allocated for marketing services.  The amount due back to the Company was in excess of $800,000.00.

85.     Plaintiffs incurred considerable expense to regain access to the stolen accounts and to migrate the content to the reacquired accounts. Those accounts included, but are not limited to, the Medium Account, Shopify, Twitter, Skycoin Telegram, Skycoin Rewards, Facebook, and Linkedin.

<h3 align="center"><u>DEFENDANTS' UNAUTHORIZED EXPENSES</u></h3>

86.     Defendants Stephens, Gevirtz, and Byerly engaged in various schemes to defraud Skycoin and attempted to invoice unapproved, non-business related costs including a Las Vegas prostitute orgy, unsubstantiated ATM withdrawals, personal entertainment costs and what is believed to be money for the purchase of drugs. These expenses were neither approved by Skycoin nor related to any legitimate business activities.

87.     For example, Stephens sent invoices to Skycoin totaling $50,000.00 for cash payments to prostitutes for two days in Las Vegas. Despite several requests, Defendants refused to produce ATM receipts for the $50,000.00 expense, could not explain how the cash was used, could not show that the expenses were business related, could not justify the amount spent, and could not produce receipts for any "cash payments."

88.     Defendants Stephens, Gevirtz and Byerly billed Symbolic Analytics for subcontractors without seeking prior authorization from Plaintiffs for such payments.

89.     Upon information and belief, defendants Stephens, Gevirtz, and Byerly engaged in a scheme to defraud Plaintiffs by invoicing full time rates for subcontractors employed part time and even invoicing Company for nonexistent persons.

90.     Defendants Stephens, Gevirtz, and Byerly billed for subcontractors work that not only both pre-dated and post-dated the Marketing Program, but which also included full time rates for part-time work and also included invoicing from nonexistent subcontractors.

91.     Defendants Stephens, Gevirtz, and Byerly billed for invalid date periods, such as submitting invoices for billing periods prior to the Marketing Program and work performed for billing periods after the termination of their relationship with Skycoin.

92.     Defendants Stephens, Gevirtz, and Byerly attempted to bill for costs which had not been submitted to the Company for preapproval and made misrepresentations to Skycoin staff, including Skycoin's Head of Events, who was responsible for event budgets. Stephens made false misrepresentations claiming that these expenses had received approval, and that the Company had been notified of the expenses..

93.     Defendants Stephens, Gevirtz, and Byerly attempted to bill the company for unapproved "events" on non-existent dates. Additionally there were several other strong indicators that many or all of the claimed expenses were fraudulent or manufactured.

## JOSHUA OGLE

94.     Joshua Ogle ("Ogle") is the owner of Far Ahead Marketing ("FAM") and co-founder of the original agency who contracted with Skycoin on or about May 19, 2019, to provide certain advertising services including Facebook Advertisements.

95.     In 2019, Stephens, Gevirtz, Kunstman, and Ogle engaged in a conspiracy to defraud Skycoin. They engaged a Wikipedia moderator to delete Skycoin's Wikipedia page in a rigged "vote for deletion" where all users voting against deletion were banned.

96.     Upon information and belief, Defendants then messaged Smietana on Telegram and offered a "Wikipedia Protection Package" costing $180,000.00 a year, to "protect" Skycoin's Wikipedia page against deletion. Company refused payment. As a result, Skycoin's Wikipedia page was, infact, deleted.

97.     Upon information and belief, after the deletion of Skycoin's Wikipedia page, Ogle, an associate of Stephens and Gevirtz, approached Skycoin and Smietana and offered marketing services to restore Skycoin's Wikipedia page, if Skycoin retained Ogle's marketing firm.

98.     Skycoin and Symbolic Analytics retained Ogle's marketing firm, without knowing at this time, his relationship and cooperation with Stephens, Gevirtz, and Kunstman. In fact, Ogle denied at this time having any contact or relationship with these persons. However, the Company later discovered Stephens had previously stated, in writing, that Gevirtz was "best friends" with Ogle and that Ogle had made misrepresentations about his personal relationships and conflicts of interest.

99.     Ogle knew that Plaintiffs would not have made payments to his marketing firmhad he not made misrepresentations and had his conflicts of interests been previously disclosed. Ogle purposely made these misrepresentations in order to obtain payments that would not have otherwise been made.

100.     Upon evidence and belief, Company later received communications showing that Ogle was cooperating and assisting Kunstman and Stephens in an extortion racket against Skycoin. Ogle approached the Company and claimed that he was a "neutral third party" and that he could negotiate and "resolve" the extortion situation. The communications indicate that Ogle was acting in collusion with Kunstman and Stephens to convince the Company to pay the extortion demands, while making misrepresentations to the Company about his conflict of interests and lying about, concealing, and denying his personal relationships with the involved persons.

101.     Skycoin paid FAM $15,000.00 in Bitcoinfor such advertising services, however, the work was never performed.

102.     Ogle made numerous misrepresentations about the nature of the services provided to defraud Skycoin and Symbolic Analytics. For instance, Ogle invoiced for and provided "reports" showing a "Youtube advertising campaign", however there was no indication or evidence that the advertisements were actually ever performed.

103.     On or about June 9, 2019, Skycoin paid FAM $16,000.00 in Bitcoinfor marketing placements in United States mainstream magazines and other online publications.

104.     Ogle arranged a "paid placements" arrangement, where Ogle would recruit journalists and arrange payments to these journalists for the publication of articles for the promotion of Skycoin. As part of FAM's marketing plan for Skycoin, Ogle introduced Smietana to journalist Morgen Peck ("Peck") in New York in June of 2019.

105.     On or about July 9, 2019, Skycoin paid FAM an additional $10,000.00 in Bitcoinfor Facebook advertising.   This Facebook advertising was never placed.

106.     On or about July 10, 2019, Skycoin paid FAM $5,000.00 by Bitcoin for two press releases. Ogle made numerous misrepresentations about the press releases and claimed that the press releases were through his own personal contacts. The company paid for a "premium" package meant to provide additional circulation in higher tier media outlets. However, Ogle performed the press releases using a commercial distribution service, instead of  the type of press release distribution that was agreed upon and paid for. Upon information and belief, Ogle's press release misrepresentation is a scheme to defraud the Company by substituting the press release service purchased for a sub-standard service to what was agreed to and paid for.

107.     On or about September 18, 2019, Skycoin paid FAM $41,000.00 Bitcoin to review its marketing activities in China and to provide guidance on appropriate advertising strategies.

The guidance was to include a report with advice and recommendations regarding the marketing and promotion of Skycoin.

108.    To provide such advice, Ogle flew to China, reviewed Skycoin's operations, however, no written report was provided. Ogle then demanded more money and claimed that he would need to fly back to Shanghai and that several tens of thousands of dollars were needed to provide the marketing strategy report.

109.    In October of 2019, Skycoin paid FAM $40,000.00 by Bitcoin for bus stop advertising.  Bus stop advertisements are ads that are placed on benches and the areas around the benches people use while waiting for public transportation. These bus stop advertisements were in fact never placed.

**BINANCE DELISTING**

110.    In and around June of 2020, because Smietana refused to capitulate to the extortion demands, Stephens, in conjunction with Kunstman and others embarked upon a scheme and plan to delist Skycoin from Binance and effectively destroy Skycoin's reputation and depress Skycoin Tokens' market value.

111.    In furtherance of this plan and scheme, Stephens solicited other individuals to make false complaints against Skycoin in order to have Binance delist Skycoin from the exchange. The false complaints they directed others to make to Binance to achieve the delisting are as follows:

a.    That Skycoin sells Skycoin Tokens customers outside of the Binance exchange but after receiving the funds, never sends those customers the Skycoin Tokens for which they paid;

b.    That individuals from Skycoin would privately meet with customers and accept payment for Skycoin Tokens at 15% below market value;

19

c. After customers consummated such side transactions, they would immediately "dump" the Skycoin Tokens on the market;

d. That Smietana would request that customers privately pay him $1,000,000.00 in Bitcoin or cash for discounted Skycoin Tokens that they could then "dump" on the market immediately and achieve a $150,000.00 profit; and

e. That Smietana and Skycoin launders money through customers by promising them an immediate 15%-20% profit through the unauthorized purchase of Skycoin Tokens.

112. Upon evidence and belief, Cuthriell and other persons were hired to harass Skycoin and interfere with Skycoin's relationships with exchanges and partners corporations, made public statements in Telegram channels bragging that they had paid journalists to publish articles to slander the company, and even publicly discussed the type and content of false reports that needed to be made against Skycoin in order to achieve a delisting from Binance.

113. As part of his plan and scheme to have Skycoin delisted from Binance, Stephens, Kunstman, and Cuthriell also orchestrated having several individuals send repeated complaints to Binance that included allegations of drug use and criminal charges against Smietana and other baseless allegations.

114. As further evidence of the conspiracy, Cuthriell publicly congratulated all persons involved in the Binance delisting of Skycoin with the exclamation of "Nice work team" and "PARTY TIME."

## COUNT I: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. §1961 AGAINST BRADFORD STEPHENS, HARRISON GEVIRTZ, AARON KUNSTMAN, AND JOEL WAYNE CUTHRIELL

115. Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 115 of this Count I as if fully set forth herein.

116. This Count I is brought by S.A. only.

117. Each of the named Defendants in this count are "persons" pursuant to 18 U.S.C. §1961(3).

118. As detailed above, these Defendants have conspired to commit a years-long and ongoing pattern of racketeering through their association with other parties organized under the common purpose of extortion and racketeering activities against Skycoin and SA. Moreover, their association has been ongoing for years for the purpose of obtaining money from and trying to destroy S.A. Accordingly, this group of Defendants and non-Defendants constitutes an association-in-fact enterprise.

119. Defendants engaged in a four-year campaign of harassment, fraud, extortion, and violent threats against both Smietana, S.A., and Skycoin.

120. Kunstman, Stephens, and associates approached Skycoin's competitors and Smietana's personal enemies and received money to fund a full-time harassment and extortion operation. Defendants'operations went on continuously over nearly a four-year period, constituting ofdozens of varied and extensive scams, extortion rackets, protection rackets and various types of fraud targeted against SA, Skycoin and Smietana.

121. Upon information and belief, this operation included up to 8 persons who were full-time staff, up to 50 persons recruited on a "per task" basis for specific operations, and dedicated IT managers for operation of "bot nets" of hundreds of computer accounts used against Skycoin and Smietana in extortion threats. The operation also included a campaign of hacking Skycoin's corporate accounts, engaging in protection rackets, as well as bribing journalists to write false statements against Skycoin and then blackmailing and extorting the Company to stop these acts of harassment.

122.     This enterprise was operated as a full-time "marketing operation" as a method of generating income and paying a salary for its members.All income derived originated from extortion, marketing manipulation, or the solicitation of competitors of Skycoin and/or personal enemies of Smietana.

123.     The persons so engaged in this enterprise openly and publicly admitted that their objective was to "Destroy Skycoin" and to drive the price of Skycoin Token to zero.

124.     The enterprise even engaged in, and induced, violent criminal acts against Smietana's person and violent theft of S.A.'s property, in retaliation for failure to pay Defendants' extortion demands.

125.     Defendants knew they were engaged in racketeering acts. Kunstman in private messages explicitly told persons "I am extorting Smietana for $1,000,000" and offered "a cut" to anyone who participated in the enterprise.

126.     These acts of attempted or successful racketeering were multiple, consistently performed by the same persons, and occurred continuously for over nearly four years, and are still on-going.

127.     This enterprise affects interstate commerce since its members are located in different states and nations and work together to achieve a common purpose.  Defendadnts are responsible for sending significant sums of money through wire transfers across state lines.

128.     The frauds detailed above also constitute violations of the Wire Fraud statute, pursuant to 18 U.S.C. §1343. The Wire Fraud violations are based upon many communications and wire transfers between these Defendants and S.A. in Illinois, Wisconsin ,Nevada, California, Singapore, and China.  These violations formed various schemes to defraud S.A. of money.

129. In addition, these extortion schemes constitute violations of 18 U.S.C. §1951, the Hobbs Act, which prohibits the obtaining of property through the use of fear, force, or violence.

130. Defendants violated the Hobbs Act when inducing violent criminal acts, such as assault, against Smietana to obtain money for their extortion demands.

131. Through their acts of violence and extortion demands, Defendants stole trade secrets from Plaintiffs including, but not limited to, software, source codes, and hardware designs.

132. Defendants' theft of the above stated trade secrets violates 18 U.S.C. §1832.

133. Taken together, these "predicate acts" constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5). Specifically, this is an "open pattern" as it is the regular way the Defendants and the enterprise do business and will not stop without judicial intervention. In short, S.A. will continue to be harmed by further extortion and extortion attempts in the future.

134. Under 18 U.S.C. §1962(c), it is unlawful for any person to conduct or participate in the conduct of the affairs of an enterprise that is engaged in or affects interstate or foreign commerce through a pattern of racketeering activity.

135. 18 U.S.C §1962(d) states, in pertinent part: "It shall be unlawful for any person to conspire to violate subsection (c) of this section." As detailed above, the Defendants have agreed to the commission of the schemes and have executed the schemes by virtue of an agreement to conduct an ongoing campaign against S.A. Therefore, the Defendants have violated 18 U.S.C. §1962(d) by agreeing to violate 18 U.S.C. §1962(c), by participating in the affairs of the association-in-fact enterprise through a pattern of racketeering activity.

136. Defendants are jointly and severally liable for damages.

137. This pattern of racketeering has damaged S.A. in excess of $75,000.

138.    These damages were directly and proximately caused by the Defendants' pattern of racketeering against SA.

WHEREFORE, Plaintiff, SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through its attorneys, The Law Office of Michael C. Goode, resepctully pray that this Honorable Court enter a judgment against each of the Defendants for three times its damages plus prejudgment interest pursuant to 18 U.S.C. §1964(c), a permanent injunction against the Defendants restraining them from further racketeering activity against S.A. or its officers or employees pursuant to 18 U.S.C. §1964(a), costs, attorneys' fees, and for such other and further relief as this Court may deem just and fair on the premises. In addition, S.A. requests a jury trial.


## COUNT II: FRAUD
## AGAINST BRADFORD STEPHENS, HARRISON GEVIRTZ F/K/A "HARRO," AND CATHERINE BYERLY

139.    Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 139 of this Count II as if fully set forth herein.

140.    Defendants Stephens and Gevirtz approached Plaintiffs advertising themselves as a legitimate advertising and marketing firm, with Stephens, Gevirtz, Young, and Eagle Web Assets (EWA) as "business partners" involved in every aspect of the "business".

141.    Defendants would later learn that these persons came from a company "EWA" which had a history of litigation and that these persons were under an FTC order for fraudulent marketing practices.

142.    Defendants Stephens, Gevirtz, and Byerly represented to Plaintiff Smietana that they would provide advertising and marketing services, including web design, online advertising, conference events, and display advertising.

143.    Defendants Stephens and Gevirtz represented to Plaintiff Smietana that they would provide advertising, web design, and marketing services for Plaintiffs in return for payment.

144.    In reality, Defendants Stephens and Gevirtz had no intention of providing any advertising, web design, or marketing of any kind for Plaintiffs.

145.    Defendants Stephens, Gevirtz, and Byerly, in fact, did not provide any advertising or marketing services for Plaintiffs.

146.    Defendants Stephens, Gevirtz, and Byerly never provided any web design services on behalf of Plaintiffs.

147.    In reliance upon the representations of Defendants Stephens, Gevirtz, and Byerly, Plaintiffs paid Defendants Stephens, Gevirtz, and Byerly approximately $800,000.00 for their services and the costs of advertising and marketing.

148.    When asked, Defendants represented to Plaintiff Smietana that they had no prior lawsuits that had been filed against them.

149.    These representations were knowingly false when made.

150.    In fact Defendants Stephens' business partners, Gevirtz, Eagle, and Young had an extensive history of litigation and had been named in multiple lawsuits and were subject to an FTC [injunction?] for fraudulent marketing practices.

151.    Following the payment of the initial $800,000.00, Defendants Stephens, Gevirtz, and Byerly requested additional money including an additional $60,000.00.

152.    These statements made by Defendants Stephens, Gevirtz, and Byerly were false when made.

153.    Defendants Stephens, Gevirtz, and Byerly made these representations to Plaintiff Smietana and other Skycoin staff with the intent to induce payments and defraud Plaintiffs.

154. Defendants created scenarios and orchestrated fraudulent crises, making numerous misrepresentations, solely for the purpose of soliciting more money from Plaintiffs.

155. Defendants Stephens, Gevirtz, Eagle, Byerly, and Young made the following misrepresentations and/or omissions upon which Plaintiffs justifiably relied to their detriment:

a. Lied about, concealed and denied history of litigation against Defendants' associates, business partners, and former corporations;

b. Failed to inform Plaintiffs of the FTC Order and government sanctions against their former company, even when explicitly asked about any history of litigation prior to payment and contract negotiations;

c. Falsely represented that an unknown third party was targeting Skycoin by linking pornographic blogs and other harmful spam content to Skycoin's website;

d. Falsely agreed to seek written pre-approval from the Company for incurred expenses;

e. Falsely represented that they would provide marketing and advertisement services to Plaintiffs;

f. Falsely representing that they would provide web design services to Plaintiffs; and

g. Falsely represented the expenses and costs of said marketing and advertising services.

156. Plaintiffs relied upon the representations of Defendants Stephens, Gevirtz, and Byerly and paid the requested amounts to Defendants.

157. As a direct and proximate result of Defendants Stephens, Gevirtz, and Byerly's improper actions, Plaintiffs have sustained substantial economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and damage to their reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against Defendants Stephens, Gevirtz, and Byerly for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT III: FRAUD AGAINST JOSHUA OGLE

158. Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 158 of this Count III as if fully set forth herein.

159. Defendant Joshua Ogle ("Ogle") is the owner of Far Ahead Marketing ("FAM") who contracted with Skycoin on or about May 19, 2019, to provide certain advertising services including Facebook Advertisements.

160. Ogle, individually and as agent, servant, or employee of FAM, represented to Plaintiffs that he would provide advertising services, including Facebook Advertisements, marketing placements in United States mainstream magazines and other online publications, press releases, bus stop advertisements, strategic marketing advice, and a "premium" press release with a circulation in Yahoo Finance, Barons, and other top tier publications

161. These statements were false when made and Defendant Ogle knew them to be false when made.

27

162. Defendant Ogle purposely misrepresented the quality of services provided by his marketing company and defrauded Plaintiffs by substituting his advertised services with a commercial release service, valued at approximately $400, and kept the remainder of the money paid by Plaintiffs.

163. Skycoin paid FAM $15,000.00 in Bitcoin for such advertising services, however, the work was never performed.

164. On or about June 9, 2019, Skycoin paid FAM $16,000.00 in Bitcoin for marketing placements in United States mainstream magazines and other online publications for the promotion of Skycoin's technologyThe articles were never published.

165. As part of FAM's marketing plan for Skycoin, Ogle introduced Smietana to journalist Morgen Peck ("Peck") in New York in June of 2019. In a meeting with Peck, Ogle, and Smietana, Peck confirmed that she would be handling the paid placements for FAM and Ogle.

166. On or about July 9, 2019, Skycoin paid FAM an additional $10,000.00 in Bitcoin for Facebook advertising. This Facebook advertising was never placed.

167. On or about July 10, 2019, Skycoin paid FAM $5,000.00 in Bitcoin for two press releases. The press releases never occurred.

168. On or about September 18, 2019, Skycoin paid FAM $41,000.00 by Bitcoin to review its marketing activities in China and to provide guidance on appropriate advertising strategies.

169. To provide such advice, Ogle flew to China and reviewed Skycoin's operations. However, no written recommendations were ever provided. Instead, Ogle and FAM's only advice was to turn over all of Skycoin's marketing exclusively to FAM.

170.    On or about September 18, 2019, Skycoin paid FAM $12,000.00 by wire transfer to create and distribute six (6) press releases.

171.    Upon failing to provide the marketing services promised, Plaintiffs made multiple requests for refunds for the services that were not provided. In response to the refund requests, Ogle claimed that he could not provide a refund but that he would "roll the money into the imminent bus stop and New York subway advertising campaign."

172.    In October of 2019, Skycoin paid FAM $40,000.00 by wire transfer for bus stop and subway advertising campaign promised by Ogle instead of providing Plaintiffs with a refund. These bus stop and subway advertisements were never placed and the money was not refunded to Plaintiffs.

173.    Defendant Joshua Ogle, individually and as agent, servant, or employee of FAM, and Defendant Far Ahead Marketing, individually and by and through its agents, servants, or employees, made the following misrepresentations and/or omissions upon which Plaintiffs justifiably relied to their detriment:

      a.    Misrepresented that they would be providing advertising services to Plaintiff;

      b.    Misrepresenting the need for additional funds to pay for advertisements that were never placed;

      c.    Misrepresented that they would provide press releases of the type agreed upon and in the method agreed upon;

      d.    Misrepresented that they would provide Facebook advertising; and

      e.    Misrepresented the cost of the advertisements that they were allegedly placing.

174.    Plaintiffs relied upon the representations of Defendant Joshua Ogle, individually and as agent, servant, or employee of FAM, and Defendant Far Ahead Marketing, individually

and by and through its agents, servants, or employees, and paid the requested amounts to those Defendants.

175.     As a direct and proximate result of Defendant Joshua Ogle's, and Defendant Far Ahead Marketing's improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"),SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against Defendant Joshua Ogle, individually and as agent, servant, or employee of FAM, and Defendant Far Ahead Marketing, individually and by and through its agents, servants, or employees, for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT IV: FRAUD
## AGAINST BRADFORD STEPHENS, AARON KUNSTMAN, HARRISON GEVIRTZ F/K/A "HARRO", JOEL WAYNE CUTHRIELL F/K/A "JOEL", F/K/A "CARIBOU"

176.     Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 176 of this Count IV as if fully set forth herein.

177.     On or about January 8, 2018, Plaintiffs entered into an agreement with Defendants Stephens, Gevirtz,  Kunstman, and  Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

178.     Following that agreement, Defendants Stephens and Gevirtz defrauded Plaintiffs by failing to provide the contracted services, creating false "threats", and extorting funds from

Plaintiffs through coercion. Once discovered, Plaintiffs attempted to distance themselves from Defendants. However, in retaliation, Defendants Stephens, Kunstman, Gevirtz, and Cuthriell began making false profiles and applications with false information in order to further defraud Plaintiffs out of approximately $2,000,000.00 worth of Skycoin product.

179.   Plaintiffs offered a reward program to entice customers to their business.

180.   In order to obtain a reward, each participant is required to submit an application which conformed to S.A.'s terms and conditions. The terms included the following:

   a.   Each customer is only allowed to have one active Skywire Rewards account within a single one month period.

   b.   Each customer is allowed to claim rewards for up to 8 Skywire nodes in a one month period.

   c.   Only one instance of the "Skywire Node" software can be run on a single physical computer.

   d.   Each customer may operate only a single reward program account within a one month period

   e.   Each computer claiming a reward must be a physically separate and independent computer.

   f.   It is a violation of the Rewards Program terms and service, for a user to run more than one Skywire node per physical computer.

181.   Defendants, Cuthriell and Stephens developed a software to run over 300 "nodes" on a single physical computer, to defraud the rewards program.

182.   Relying on the misrepresentations, S.A. provided these persons rewards to which they were not entitled, totaling approximately $2-$4 million, the precise amount is unknown as

they have continued to submit these bogus applications continuously and under multiple fake aliases. It is a regular method of the conspirators' business to harass S.A. in this and other ways, and they will not stop without judicial intervention.

183. Plaintiffs relied upon the information provided in those online applications and profiles.

184. Had Plaintiffs known that these profiles and applications were being generated and submitted by Defendants Stephens, Kunstman, Gevirtz, and Cuthriell repeatedly in order to accumulate Skycoin under false pretenses, Plaintiffs would not have made Reward Program payments to Defendants Stephens, Kunstman, Gevirtz, and Cuthriell.

185. Defendants Stephens, Kunstman, Gevirtz, and Cuthriell made these repeated false representations to Plaintiffs through these applications and profiles even though they knew that these statements were false and made under false pretenses, with an intent to induce Plaintiffs into providing the $2,000,000.00 in digital payments/digital assets/digital currency.

186. Defendants Stephens, Kunstman, Gevirtz, and Cuthriell have at all relevant times perpetuated and deliberately concealed this fraud from Plaintiffs.

187. Defendants Stephens, Kunstman, Gevirtz, and Cuthriell have engaged in a scheme to defraud Plaintiffs by consistently attempting to conceal this fraud and continue to submit false applications and profiles to Plaintiffs.

188. As a direct and proximate result of Defendants Stephens, Kunstman, Gevirtz, and Cuthriell's improper actions and misrepresentations, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

189.     Plaintiffs relied upon the accuracy and truthfulness of the submitted applications and profiles, and, had Plaintiffs been aware that the representations of Defendants Stephens, Kunstman, Gevirtz, and Cuthriell were false, Plaintiffs would not have acted as they did.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against Defendants STEPHENS, KUNSTMAN, GEVIRTZ, AND CUTHRIELL for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT V:  CIVIL CONSPIRACY
## AGAINST ALL DEFENDANTS

190.     Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 190 of this Count V as if fully set forth herein.

191.     Defendants conspired with one another to defraud Plaintiffs, tortiously interfere with their business relationships, commit various acts of wire fraud, computer fraud, and convert Plaintiffs' property surreptitiously.

192.     Defendants worked in concert with one another to accomplish this fraud as evidenced by their various communications and concerted acts against Plaintiffs.

193.     On information and belief, Defendants intended to defraud Plaintiffs out of their money, their product, and to tortiously interfere with their business relationships.

194.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against DEFENDANTS for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

### COUNT VI: TORTIOUS INTERFERENCE
**Against Bradford Stephens, Aaron Kunstman, Harrison Gevirtz f/k/a "HaRRo", Ryan Eagle, Adam Young, Far Ahead Marketing, Joel Wayne Cuthriell f/k/a "JOEL", f/k/a "Caribou", Tristan Greene, Bryan Clark, Catherine Byerly, Steven Leonard, Joshua Ogle, and *UNKNOWN INDIVIDUALS AND COMPANIES***

195.    Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 195 of this Count VI as if fully set forth herein.

196.    Plaintiffs  Skycoin, S.A., and Smietana  developed business relationships and contracts with various vendors and customers since its launch in 2013.

197.    Skycoin sells non-fungible electronic products that fluctuate in value based upon the market rates on specific internet exchanges.

198.    For Skycoin to do business, it must participate in these internet exchange markets, such as, but not limited to, Bittrex, Binance, Kraken, Poloniex and Bifinix, in order to sell its goods.

199.    Defendants Stephens, Kunstman, Gevirtz, Eagle, AdamYoung, FAM, Cuthriell , MorgenPeck, Greene, Clark, Byerly, Leonard, Ogle, and *UNKNOWN INDIVIDUALS AND*

*COMPANIES,* orchestrated various schemes to undermine the reputation of Plaintiffs and cause these internet exchange markets, specifically, Bittrex and Binance, to remove Plaintiffs' products from their exchanges (known as "Delisting").

200.    Defendants were fully aware of Plaintiffs' position within these internet exchange markets.

201.    Defendants were fully aware that Plaintiffs' Skycoin Token must be sold on these internet exchange markets.

202.    Defendants were fully aware that Plaintiffs had agreements and/or expected agreements with these internet exchange markets.

203.    Defendants, nonetheless, acted in concert to cause these internet exchange markets to remove Plaintiffs' Skycoin Token from those markets.

204.    At all relevant times herein, Defendants intended to cause harm to Plaintiffs' reputation and finances in order to interfere with their relationships with these internet exchange markets, along with their customers and vendors.

205.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against DEFENDANTS for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT VII: CONVERSION
## Against StevenenLeonard

206.     Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 206 of this Count VII as if fully set forth herein.

207.     Defendant Leonard became aware that Plaintiff S.A. owned in excess of 180 Bitcoins.

208.     Defendant Leonard converted over 180 Bitcoin owned by S.A. and stole the electronic currency without permission or authority.

209.     Upon evidence and belief, Leonard was recruited by Kunstman, Stephens, and Cuthriell to steal Skycoin's website, www.skycoin.net,  as part of a conspiracy by to recruit disgruntled Skycoin employees in an attempt to cause damage to Skycoin and to induce extortion payments.

210.     Leonard refused to return the website to Skycoin unless Bitcoins were paid to Kunstman and Leonard. The theft of the website caused Plaintiffs' $500,000.00 in damages by forcing Plaintiffs to spend emergency funds.

211.     Defendant Leonard was also one of numerous employees recruited to steal Skycoin's intellectual property and deliver the findings to Defendants Kunstman, Stephens, and Cuthriell. [add exhibit]

212.     The overtaking of Skycoin's website and theft of the company's intellectual property were both part of a larger scheme to change Skycoin into a new company, "Skycoin Cash", and claim that all of Skycoin's employees had quit their positions with the company to join Skycoin Cash.

213.     Since its conversion, Defendant Leonard has not returned the amount of Bitcoin stolen from Plaintiff S.A., despite repeated requests for him to do so.

214.     As a direct and proximate result of Defendant Leonard's improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against DEFENDANTS for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT VIII: VIOLATIONS OF THE DEFEND TRADE SECRETS ACT AGAINST ALL DEFENDANTS

215.     Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 215 of this Count VIII as if fully set forth herein.

216.     As part of Plaintiffs' business, Plaintiffs developed hardware and software that worked in conjunction with each other to provide customers with the ability to use and "mine" Skycoins, while also allowing customers to make initial coin offerings.

217.     The hardware designs were proprietary and only known to Skycoin officers.

218.     The software and corresponding source code allowed Plaintiffs network and programs to generate, sell, and distribute their digital assetsto customers.

219. Defendants surreptitiously broke into Plaintiffs' source code and computers, misappropriated the source code for their own use and stole the hardware designs in the hopes of taking over Plaintiffs' business.

220. As set forth above, Defendants have misappropriated and used Plaintiffs' Trade Secret source code and proprietary software architecture, including without limitation confidential information relating to Plaintiffs' proprietary architecture design, proprietary software, and internal software methodology ("Plaintiffs' Trade Secrets").

221. Plaintiffs' Trade Secrets were sufficiently secret and maintained so that only Plaintiffs' principal, Brandon Smietana, was privy to each and every trade secret and their collective uses.

222. Plaintiffs' Trade Secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

223. Plaintiffs have at all relevant times taken steps that are reasonable under the circumstances to maintain the secrecy and confidentiality of their Trade Secrets.

224. Defendants attained these trade secrets of Plaintiffs by breaching Plaintiffs' software and source code in order to use and disseminate Plaintiffs' Trade Secrets.

225. Defendants were fully aware that the information comprising Plaintiffs' Trade Secrets were secret, confidential, and maintained in such a way as to prevent disclosure to third parties, and specifically competitors.

226. Defendants violated the Defend Trade Secrets Act by and through the following acts and omissions:

    a. Utilizing Plaintiffs' Trade Secrets in Defendants' products, equipment, and within its industry;

b. Misappropriating Plaintiffs' proprietary hardware designs;

c. Misappropriating Plaintiffs' source code;

d. Divulging Plaintiffs' Trade Secrets to third parties; and

e. Using improper means to access and misappropriate Plaintiffs' source code.

227. As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against DEFENDANTS for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT IX: UNJUST ENRICHMENT
### Against All Defendants

228. Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 228 of this Count IX as if fully set forth herein.

229. Defendants were provided approximately $860,000.00 in funds to provide marketing, advertising, and web design services to Plaintiffs.

230. Defendants also obtained approximately $2,000,000.00 in Skycoin Tokens through false reward applications.

231.    These funds and goods were not earned and Plaintiffs received no equivalent value for them in return.

232.    It would be unconscionable and against fundamental principles of justice, equity and good conscience for Defendants to retain the benefit from those funds, which were paid by Plaintiffs without receiving any benefit in return.

233.    As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against DEFENDANTS for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT X: DEFAMATION
## Against Morgen Peck

234.    Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 234 of this Count X as if fully set forth herein.

235.    Defendant The New Yorker is an American weekly magazine publication.

236.    At all times relevant herein, Defendant Peck was an agent of The New Yorker.

237.    At all times relevant herein, Defendant Peck was an apparent agent of The New Yorker.

238. At all times relevant herein, Peck was acting within the course and scope of her authority as an agent of The New Yorker.

239. At all times relevant herein, Peck was acting within the course and scope of her authority as an apparent agent of The New Yorker.

240. On Aug 18, 2021 an article submitted by Morgen Peck was published in The New Yorker. (*See* Exhibit A)

241. The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

242. Peck published blatant lies and misrepresentations about Plaintiffs in her article including, but not limited to the following:

    a. Misrepresenting Smietana's relationship with Defendant Stephens and Defendant Stephens' involvement with Skycoin and Skycoin's marketing campaign; (*See* Exhibit A)

    b. Statements alluding to Smietana and Skycoin as a fraud and a scammer, such as:

        1. "In a way, it makes you into a fraud";

        2. "Is it a scam? I'm 99 percent sure of it"; and

        3. Suggesting that Skycoin was part of a "pump and dump" scheme. (*See* Exhibit A)

    c. Falsely stating Stephens has recordings of Smietana stating, "We want to feminize the peasant population to make them more docile ... [i]t's so they don't revolt." (*See* Exhibit A)

1. Smietana asked Peck on multiple occasions regarding the existence of the alleged recording to verify the contents of her claims for this statement, however Peck never confirmed that she obtained such a recording, even though it was used as a proported source for factual information in the article.

2. Smietana also denied such statements to Peck multiple times, each time reiterating that they were fabricated and untrue. Peck still published the statements.

3. As a result of the publication of the article, a Neo Nazi publication cited to the false statement from Peck's article quoting Smietana, and thereby causing damage to Plaintiffs' reputation.

4. As a result of the publication of this statement, Smietana was subjected to numerous death threats, harrassment, and various hate crimes.

d. Stating falsely that Smietana invited Binance executives to a Skycoin party during a 2018 conference in Las Vegas and instructed Stephens to hire prostitues for the executives; (*See* Exhibit A)

1. In fact, it was confirmed there were no Binance executives at the conferece and the party was a private party of Defendant Stephens, without any affiliations to Skycoin or Plaintiffs. (*See* Exhibit F)

e. Conclusory and unsupported statements by others;

1. Stating that "according to several people" (without any further evidence), that Skycoin privately sold to investors at a discounted rate; (*See* Exhibit A)

2. The article continuously includes unsupported statements supposedly from "employees" of Skycoin, however Peck told Smietana in conversations that she did not have documentation to show who these "employees" were, if and when they worked at Skycoin, or any confirmation of their statements.

f.   Falsely accusing Smietana of pre-mining "a hundred million coins, which were scheduled for circulation"; (*See* Exhibit A)

1. Peck published this statement with full knowledge that Skycoin does not engage in any mining.

2. During fact checking, Peck referenced a website that listed companies with pre-mine scams. (https://altcoins.com/scamcoins) (*See* Exhibit B).

   i.   The website listed "SYC Skycoin – premined" under a list titled, "List of scamcoins – do not use"

   ii.  SYC Skycoin is a completely different company from SKY Skycoin (Plaintiff).

   iii. Peck knew that SYC was not Plaintiffs' company and that SYC was not SKY.

      iv.    Therefore, Peck falsely accused and published in her article that Plaintiff Skycoin engaged in pre-mining.

g. Falsely accusing Smietana of directing Skycoin's marketing unit to purposely spread negative rumors to attract attention by stating "In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention"; (*See* Exhibit A)

    1. Peck does not provide support to confirm where this chat was from, who the "investors" were, or the full context of the conversations.

    2. The quote itself is purposely suggestive and alludes that Skycoin publishes negative rumors for promotion, but does not clarify who "they" are that "spread negative rumors. "

h. Falsely accusing Smietana of "plotting new distractions";

    1. In support, Peck quoted Smietana, "Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it."

    2. The quote was purposely skewed by Peck and taken out of context to defame Smietana and Skycoin.

    3. The quote is a snippet of a message that clearly signifies a joke, in which the full text reads "The media is retarded. They are still writing articles about the 'insider trading' of cat memes, fake news. Quick, someone photoshop video of me being beheaded by ISIS and see if you can get

them to write an article about it. 'Kittycash CEO beheaded by ISIS after SEC investigation.'" (*See* Exhibit C)

i.  Purposely taking direct quotes from chatrooms/messaging conversations and placing them out of context to twist their meaning and damage Plaintiffs;

   1.  Peck wrote, "A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coordinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved.)" (*See* Exhibit A)

      i.  The quote was purposely misconstrued as it had nothing to do with insider trading channels;

      ii. It was evident from the chat conversations that any reference to any "secret insider trading" was a joke. (*See* Exhibit D)

     iii. Peck knew that the "secret chat rooms" were, in fact, public channels, accessible to all people.

j.  Falsely accusing Smietana of having sole control of the "pre-mined" coins and Skycoin's virtual wallets; (*See* Exhibit A)

   1.  It is public knowledge that Skycoin is an incorporated corporate entity and not under the sole control of one person.

45

2. Peck had posession of Skycoin's incorporation documents and corporate structure, and therefore knew, or should have known, that her statements were false.

k. Accusing Smietana of soliciting advice from an online personality who used a Hitler avatar in his profile; (*See* Exhibit A)

1. Peck admitted to Smietana during fact checking that she could not find any evidence substantiating her statement that Smietana solicited a Hitler avatar user.

2. Peck continued to publish the above statement, knowing its defamatory and false nature.

l. Alleging that Smietana lied about the extent of his medical injuries sustained from the attack on himself and his girlfriend, even after publishing that Smietana's attackers admitted to detaining and injuring Smietana and his girlfriend; (*See* Exhibit A) and

1. Smietana provided Peck with copies of court proceedings and medical records, completely contradicting the false statements she published in the article.

m. Alleging that Smietana used the attack on himself and his girlfirend to "use his power to freeze Skycoin transactions," (*See* Exhibit A) when Smietana clearly stated in an official announcement to the Company that funds were frozen after

making sure all Skycoin staff were safe after the attack and extortion demands. (*See* Exhibit E)

1. Peck knew that Skycoin's lead developer, Defendant Steven Leonard – not Smietana - had initated freezing the stolen funds from the Chinese marketing team and employee accounts after the company detected embezzlement.

2. Peck knew that the funds that were frozen were solely company accounts.

243. Defendant Peck published that "Stephens came up with a plan to strip Smietana of power and transfer management of the company to a foundation." (*See* Exhibit A)

244. Defendant Peck, knowing that Defendant Stephens' intentions were to take the Company from Smietana, continued to base her article on information provided mainly by Defendant Stephens, completely disregarding his clear bias and motive to disenfranchise Smietana from Skycoin and seize control of the Company.

245. After publication of the article, a former employee of Defendant Stephens and Kunstman contacted Plaintiffs stating that Peck received money to intentionally produce and publish a defamatory article attacking Plaintiffs and would receive bonus payments for destroying Skycoin's relationship with Binance. (*See* Exhibit F)

246. The statements made by Defendant Peck in the article were purposely false and defamatory in return for financial gain and personal benefit of Peck.

247. Defendant Peck acted within the scope of her agency with principal The New Yorker when she submitted and published the article.

248. As a direct and proximate result of Defendant Peck's libelous publication, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

249. As a direct and proximate result of the libelous publication in the New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harrassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against Defendant PECK for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT XI: DEFAMATION
### AGAINST CONDÉ NAST d/b/a THE NEW YORKER AND THE NEW YORKER, as an individual and agent of CONDÉ NAST

250. Plaintiffs repeat and reallege Paragraphs 1 through 114 and Paragraphs 235 to 249 of this Complaint as and for Paragraphs 250 of this Count XI as if fully set forth herein.

251. Defendant Condé Nast is a global mass media company operating various brands, including Defendant The New Yorker.

252. Defendant The New Yorker is an American weekly magazine publication owned and operated by Defendant Condé Nast.

253. At all times relevant herein, Defendant The New Yorker was an agent of Condé Nast.

254.     At all times relevant herein, Defendant Peck was an agent of The New Yorker.

255.     At all times relevant herein, Defendant The New Yorker was an apparent agent of Condé Nast.

256.     At all times relevant herein, Defendant Peck was an apparent agent of The New Yorker.

257.     At all times relevant herein, The New Yorker was acting within the course and scope of its authority as an agent of Condé Nast.

258.     At all times relevant herein, The New Yorker was acting within the course and scope of its authority as an apparent agent of Condé Nast.

259.     The New Yorker has 6 million monthly readers, 16 million digital users, and 16.8 million social media followers.

260.     On August 18, 2021, The New Yorker, acting as an agent of Defendant Condé Nast, published Defendant Peck's article which reached millions of readers worldwide. (*See* Exhibit A)

261.     Approximately one week prior to publication, Anna Boots, Fact Checker for The New Yorker, contacted Smietana regarding the article and stated:

> a.   That Peck's article was the longest fact checking she ever had to do (approximately 3 months);
>
> b.   That numerous unsubstantiated claims were made in Peck's article;
>
> c.   That Peck interviewed Michael Terpin regarding the 2018 Las Vegas conference and he informed her that Defendant Stephens was an unreliable source and a compulsive liar;

d. That the fact checking process was difficult to complete because almost all the information was provided two people, with most claims and statements being unsubstantiated; and

e. That her editor at The New Yorer set a "firm publication date regardless of [fact checking] completion."

262. The New Yorker, acting within the scope of its agency, published Peck's article without properly and completely fact checking the defamatory statements made and checking Peck's sources and their credibility.

263. As a direct and proximate result of the libelous publication in The New Yorker, Plaintiffs suffered economic damage through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

264. As a direct and proximate result of the libelous publication in the New Yorker, Smietana suffered serious damage to his reputation, which resulted in numerous death threats, harrassment, and financial harm to his company.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against Defendants CONDÉ NAST d/b/a THE NEW YORKER and THE NEW YORKER, individually and as agent of CONDÉ NAST, for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT XII: BREACH OF FIDUCIARY DUTY
### Against All Defendants

265.     Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 273 of this Count XII as if fully set forth herein.

266.     At various times Defendants Stephens, Kunstman, Gevirtz, Eagle, AdamYoung, FAM, Cuthriell, Greene, Clark, Byerly, Leonard, and Ogle were acting as contractors hired by Plaintiffs to perform certain duties.

267.     Per that relationship and agreement, Defendants were to adhere to the terms of the agreements and provide the services promised.

268.     Defendants instead engaged in various schemes to defraud Plaintiffs.

269.     Defendants did not provide the promised services to Plaintiffs, despite Plaintiffs having paid for those services.

270.     Defendants had a duty to adhere to the terms of the agreements and to provide Plaintiffs with the promised services.

271.     Defendants breached that duty by failing to adhere to the terms of the agreements and failing to provide Plaintiffs with the promised services.

272.     As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C.

Goode, respectfully pray that this Honorable Court enter a judgment against DEFENDANTS for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

## COUNT XIII: BREACH OF CONTRACT
### Against Bradford Stephens, Aaron Kunstman, Harrison Gevirtz f/k/a "HaRRo", Joel Wayne Cuthriell f/k/a "JOEL", f/k/a "Caribou"

273.    Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 281 of this Count XIII as if fully set forth herein.

274.    On or about January 8, 2018, Plaintiffs entered into an agreement with Defendants Stephens, Gevirtz, Kunstman, and Cuthriell wherein these Defendants agreed to provide marketing services for Plaintiffs.

275.    Following that agreement, Stephens, and Gevirtz failed to provide the contracted services, creating false "threats," and extorting funds from Plaintiffs through coercion.

276.    Defendants did not adhere to the terms of the Agreement despite payment.

277.    Plaintiffs, at all times relevant herein, fully performed on their obligations under the Agreements with Defendants.

278.    Defendants failed to provide any advertising or marketing services to Plaintiffs during the duration of the contract.

279.    Defendants breached their obligations under the contract through the following acts or omissions:

a.   failing to provide advertising services;

b.   Failing to provide marketing services;

c.   failing to use the funds provided for the advertising or marketing services;

d.   failing to provide web design services;

52

e.   failing to use funds to effectuate any web design;

f.   failing to stay within the bounds of the expense budget; and

g.   attempting to extort additional funds outside of the contract terms.

280.   As a direct and proximate result of Defendants' improper actions, Plaintiffs have sustained damage economically through loss of business, loss of revenue, loss of contracts, loss of market visibility, and loss of reputation.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore Company, and SYMBOLIC ANALYTICS, INC., a Delaware Corporation ("SA"), by and through their attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against DEFENDANTS for an amount in excess of $75,000.00, and for such other and further relief as this Court may deem just and fair on the premises.

### COUNT XIV: Violations 720 ILCS 5/12-7.1
### Against Bradford Stephens, Aaron Kunstman, Harrison Gevirtz f/k/a "HaRRo"

281.   Plaintiffs repeat and reallege Paragraphs 1 through 114 of this Complaint as and for Paragraph 289 of this Count XIV as if fully set forth herein.

282.   On information and belief, during the years 2019 – 2021, Defendants Stephens, Kunstman, and Gevirtz, through various internet media and in person, made numerous antisemetic statements and threats of death, kidnapping, and other acts of violence against Plaintiff Brandon Smietana.

283.   All of these threats were based on Smietana's religion and Jewish heritage.

284. Defendants also discussed Company as a "Jew coin", called holders of Skycoin Tokens "Skygoyim",and other similar hate speech, which Smietana perceived as a direct threat due to his being Jewish.

285. Defendants posted these messages on various social media platforms and also made said threats directly to Plaintiff.

286. In furtherance of their treaths, Assailants invaded Smietana's home where they violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of bussiness, and cryptocurrency wallets.

287. Under threats of further violence and death, Smietana provided the passwords to his computer. The Assailants stole 18.88 Bitcoin with a market value of $139,160.33 and 6,466 Skycoin with a market value of $81,018.98, totalling $220,179.31.

WHEREFORE, Plaintiffs, BRANDON SMIETANA ("Smietana"), by and through his attorneys, The Law Office of Michael C. Goode, respectfully pray that this Honorable Court enter a judgment against DEFENDANTS, Defendants Bradford Stephens, Aaron Kunstman, Harrison Gevirtz f/k/a "HaRRo," for an amount in excess of $75,000.00, punitive damages, and for such other and further relief as this Court may deem just and fair on the premises.


Respectfully Submitted,

**BRANDON SMIETANA,**
**SKYCOIN GLOBAL FOUNDATION**
**LIMITED, and SYMBOLIC ANALYTICS**


By:_____/s/Michael C. Goode_____

One of Their Attorneys

Michael C. Goode, Esq.
Michael C. Goode & Company
111 West Washington Street, Suite 1750
Chicago, Illinois 60602
lawoffice_mcgoode@yahoo.com

# EXHIBIT A

ANNALS OF TECHNOLOGY

# PUMPERS, DUMPERS, AND SHILLS: THE SKYCOIN SAGA

*The cryptocurrency promised to change the world and make its users rich in the process. Then it began to fall apart.*

**By Morgen Peck**

August 18, 2021



Illustration by Nata Metlukh

O n an April afternoon in 2011, a twenty-seven-year-old tech entrepreneur named Bradford Stephens arrived at a stucco bungalow near the canals of Venice, California. He had recently started a new data-analytics company, and had come to speak with a coder named Brandon Smietana, whom he hoped would get involved. Stephens had already met Smietana online, where he uses the handle Synth, and where he often debated minute points about math and programming. When Stephens and Ryan Rawson, an employee who tagged along, arrived, Smietana invited them into a carpeted den. A computer sat on a table, its casings removed to reveal a tangle of circuits; a sleeping bag lay on a sofa. Smietana was in his early twenties, with dark hair and a youthful face. Rawson told me, "He had the air of this mad scientist couch surfing." Stephens pitched his new company, but got no traction. Smietana had turned his attention to a new technology: cryptocurrency. "The only people who have to work for money are the people who cannot create it or print it out of thin air," he told them.

The first cryptocurrency, Bitcoin—released in 2009 by an anonymous programmer (or a group of them) called Satoshi Nakamoto—was a feat of computational brilliance. A bitcoin is an abstract unit of value that people track and spend with digital wallets. When someone contributes her computer's power to process Bitcoin transactions, the computer also races to solve an equation, a process called "mining." Each solution that meets certain criteria mints new coins. The number created decreases by half every four years or so—an event known as the Halvening—which keeps the supply limited, guarding against inflation. The whole economy is maintained on a blockchain, a shared ledger that keeps a tally of every Bitcoin transaction. As miners add transactions, the Bitcoin software coördinates and finalizes their contributions, making the ledger transparent and unchangeable and the system nearly impossible for governments to shut down.

But the technology has a flaw: as more people use it, transactions become slower and more expensive. The average transaction fee fluctuates wildly; one day last

week, it was two dollars and thirty-three cents, making it more expensive than any major credit card for everyday purchases. The pursuit of a better Bitcoin quickly became a full-blown academic field, with its own conferences, university courses, and peer-reviewed journals. But, as Smietana explained over the next few years to anyone who would listen, he had the solution. He was designing a cryptocurrency that could be sent around the world instantaneously, for next to nothing. He called it Skycoin.

He was going to use this currency, he said, to create a decentralized version of the Internet, called Skywire. He planned to build a large mesh network, a system that allows people to use special Internet routers to share bandwidth with their neighbors. With enough members, a network can bypass service providers, making it harder for corporations and governments to surveil Internet use. But it's difficult to retain volunteers. "A community network really needs density before it is useful," Brian Hall, of NYC Mesh, the largest community network in the U.S., wrote in a blog post. "It can be a chicken and egg problem." Smietana's project proposed a different way to attract people: pay them. His customers would share bandwidth using routers called Skyminers, and get paid for their service in Skycoin. He envisioned a new cryptocurrency spent over a community-owned Internet, calling it "the last step to fulfilling Satoshi's mission."

Stephens left his first meeting with Smietana believing that he could be destined for greatness. Skycoin launched publicly two years later, in 2013. The following year, Stephens attended a party at Smietana's new place, an unrenovated warehouse just south of L.A. Someone had painted the walls with images of horned monsters. "It was very Burning Man meets H. P. Lovecraft," Stephens told me. Stephens's friend Baron Chat, a photographer who attended, said, of Smietana, "He seemed to be receiving his signal from a different station than

everyone else." According to Stephens, Smietana asked him to join the fledgling project, but he demurred. (Smietana said he doesn't remember seeing Stephens at the party.)

The first cryptocurrency boom arrived in 2017. "Several investors I knew, and a lot of my friends, started pivoting from angel investing to putting money in crypto and seeing insane returns," Stephens told me. Skycoin had a "token sale"—a sort of I.P.O. for cryptocurrencies—and was listed on two small exchanges. By the end of 2017, its price had gone from a little more than a dollar per coin to about fifty dollars per coin. That December, while Stephens was on vacation with his wife in Japan, Smietana messaged him with another chance to get involved. It seemed like an opportunity to work on something revolutionary. But he also thought, Everybody else is getting rich off crypto, so why not me? He said that he later told Smietana, "I'm going to need 50K up front and I gotta hire a team." After a couple days, he checked his Bitcoin wallet and found fifty thousand dollars sitting in it. "I'm, like, 'I guess I'm hired,' " he said. (Smietana denies sending the money, though he had said he would do so in texts, and there's a record of such a transaction on the Bitcoin ledger.) Before leaving Kyoto, he and his wife had visited a shrine to Inari, the Shinto god of rice, where they left offerings and made wishes. His wife wished for the health of her father, who was battling cancer. "I asked for wealth and adventure," Stephens told me. "And I got one of those."

In the past decade, a shift has occurred in the way that cryptocurrencies are distributed. Satoshi put bitcoins into circulation through a reward system: the more computing power you contribute, the more coins you can mint. Some early adopters paid their rent simply through mining. Around 2012, though, people began devising blockchains that could be used for more ambitious applications: supply chains with real-time geolocation, for example, or patient-controlled medical records. Such projects required capital, compelling founders to experiment with less democratic ways to distribute coins. In 2013, J. R. Willett, the founder of Mastercoin, invented the "initial coin offering," or I.C.O., the first

the founder of Mastercoin, invented the "initial coin offering," or I.C.O., the first token sale: developers partially pre-mined their tokens and then sold them off to raise money. Michael Terpin, who has managed two hundred such token sales, and who handled public relations for Skycoin, told me that the scheme empowers entrepreneurs. "Somebody who had an innovative product could sell directly, prior to it being built, to an audience of enthusiasts," he said, without having to "give up a third of the company."

A frenzy followed a few years later. Since 2017, hundreds of projects have announced token sales. One of the most lucrative, EOS, raised about three and a half billion dollars in a yearlong I.C.O. Many projects amassed funds even before their blockchains or applications existed; some prepared assiduously, but others merely threw together a Web site, a list of advisers (sometimes without their knowledge), and some semblance of a technical paper (sometimes plagiarized). "A playbook really emerged for how to set up a legitimate-looking I.C.O.," Matt Chwierut, the head of research at Smith & Crown, a blockchain research firm, told me.

In 2018, I attended the North American Bitcoin Conference, in Miami. On the main stage, representatives from companies with unpronounceable names riled up the crowds. Downstairs, an arcade of booths hawked every kind of blockchain project: smart glasses, cargo robots, refugee-identity documents. At a booth for a group claiming to build a volunteer emergency-services network, I asked why the endeavor required a coin. The attendant told me to come back later when someone more technical would be arriving.

Because bitcoin mining is regulated by algorithms, everyone, in theory, has a fair chance of getting new coins. But, to receive pre-mined coins in a token sale, you often have to buy publicly at the sale price or else negotiate a deal behind the scenes. "A lot of coins were being sold on the side and in secret," Josh, a major cryptocurrency investor—who eventually bought into Skycoin, and requested that I use only his first name, out of concern for his safety regarding another matter—

told me. "You'll do special deals with people if they give you three or four or five million dollars up front." This created a sense that making your fortune required being in the right room to get the right tip.

On the second night of the conference, I went to a strip club for an after-party, where flashing your badge got you a crypto-inspired cocktail. (I ordered a Satoshi Sour.) Guests exchanged advice, sure that they were getting the best inside information. But a few hours later a friend whisked me off to a more exclusive party, thrown at a beachside bar by Patrick Byrne, the former C.E.O. of Overstock. (Byrne stepped down in 2019, after it was revealed that he had had an affair with the Russian agent Maria Butina.) The attendees were celebrating the hundred-million-dollar token sale of Byrne's trading platform, TZero, which he said was going to "drag Wall Street behind the barn, kill it with an axe, and re-create it on blockchain." There were giant platters of sushi and oysters; the rapper Flo Rida pulled Byrne up onto the bar for a sing-along. Guests exchanged invites to exclusive chat rooms on Telegram, an app favored by coin enthusiasts. I turned to a man next to me and asked what had brought him to the party. He rubbed his thumb and forefinger together and shouted, "Making money."

The employment structure at Skycoin was loose, and Stephens joined without a contract. "Here I was, a guy used to wrangling hundred-page venture-capital contracts, and I'm joining a company with no last names and barely any first names," Stephens said. Smietana, who by then was living in Shanghai, had pre-mined a hundred million coins, which were scheduled for circulation. Skyminer routers were just starting to ship, but sales had already outstripped production. Smietana estimated that operators who used Skyminers could make between fifteen thousand and forty-five thousand dollars a month. Most coinholders I spoke to were young men around the world—medical students, craftsmen, 3-D animators—who believed in the project. In chat rooms, Smietana's followers addressed him with reverence. "We all are in honor to speak with synth," a user called Anosis wrote. "It's like having a chance to talk to Satoshi."

Satoshi.

Although Stephens studied computer science in college, he admitted that, when he started working with Skycoin, he "hardly knew anything about crypto." He was told to handle marketing, and assembled a team composed mostly of friends and former associates. (Smietana now claims that he contracted a marketing company that Stephens ran, not Stephens himself.) But he soon realized that word about the project was already spreading. Large investors recruited in their own circles, and smaller coinholders hyped Skycoin on social media. At one point, Skycoin advertised a bounty program that promised users coins in exchange for promotional activities, such as writing blog posts and creating YouTube videos. One user-made video, titled "Skycoin - To the Moon," featured footage of a shuttle blasting off next to a chart of Skycoin's market value, interspersed with a closeup of glossy lips and the words "YOU COMIN'?" People who proved their worth on Telegram often got pulled up the ranks. "I started to spend 90 hours a week in the chat room," a user called Sudo, who became one of Skycoin's Telegram channel moderators, and who refused to tell me his name, messaged me. "They seen how active I was and offered me a job."

By early January, 2018, the total estimated value of pre-mined Skycoins had reached almost five billion dollars. Smietana sent representatives to conferences in New York, Lisbon, San Francisco, and Singapore, and arranged a retreat in Mauritius. A former marketing contractor, who requested anonymity out of fear of harassment, recalled that Smietana could spend lavishly on the people who worked with Skycoin, in one case paying for cryotherapy, vitamin injections, thousand-dollar steak dinners, and a twelve-thousand-dollar trip to the Esalen Institute. "Dude was very liberal with his spending and could be very generous," the marketing contractor said. The team posted a video of a yacht party, and thundered around in Ferraris. In New York, Skycoin reps cruised in a helicopter to grab footage of a Skyminer held over Manhattan's skyline.

That month, Stephens flew to Las Vegas to speak on a panel at the CoinAgenda

summit. He wasn't up to speed on the technical aspects of Skycoin yet, but he held a Skyminer over his head and said, "You all are the first to see the new Internet!" On the first day of the conference, Smietana sent Stephens a voice

memo with an urgent request. He was hoping to get Skycoin listed on Binance, one of the world's largest cryptocurrency exchanges, which could help secure its legitimacy. During the I.C.O. boom, it was common for projects to pay a "listing fee" in order to be included on an exchange. (Binance claims that it chooses projects based solely on "strict security, legal, and regulatory compliance standards." In 2018, facing pressure, it announced that it would donate its listing fees to charity.) Smietana said that he had paid Binance executives seven and a half million dollars but that they hadn't followed through. (Binance confirmed that Skycoin paid it a hundred and fifty thousand Skycoins to spend on "promotion," which were worth seven and a half million at the coin's peak.) Smietana told Stephens to entertain the executives, to sweeten the deal. Stephens planned a party in a penthouse suite at the Bellagio. Smietana gave explicit instructions via voice messages: "You have to buy prostitutes for the people at Binance," he said. "Get them, like, three girls each." (Smietana denies any involvement in the party, and claims that his voice messages about it were "either a joke or a deep fake but probably a deep fake.")

That night, Stephens and Baron Chat, who had also started working on Skycoin's marketing, along with Catherine Byerly, another member of the team, sat in the hotel suite, with champagne on ice. Six escorts arrived at nine, and the employees instructed them to make the Binance executives feel like "rock stars." "To them, I was this, like, stereotypical businesswoman in an Ann Taylor dress," Byerly said. "But inside I'm thinking, How did my decisions lead me here?" Chat said, "It felt almost like you were in the process of living out some bizarre reality that sometimes you see in the movies. The weird excess . . . Crazy shit happens when you have a corporate account and a green light." By ten o'clock, the executives hadn't shown up, and Stephens began to worry that he'd lost the deal. He couldn't reach Smietana, so he frantically called the event organizers. They explained that

not only had no Binance reps showed up at the conference—they weren't even on the registration list. (A spokesperson at Binance told me that the company neither requested nor knew about the party.) "That's when I started taking anything Brandon said with a grain of salt," Stephens told me. Still, he decided that, "if this is going to be weird, I'm going to make it memorable weird." Some of the escorts took their pay and left; the rest drank champagne and played Cards Against Humanity with the group into the morning.

When Stephens returned from Las Vegas, he set about mapping Skycoin's progress. One of the company's main selling points was Obelisk, an algorithm that allowed it to send coins cheaply and quickly. On Telegram, Smietana insisted that everything that came before was "obsolete and primitive." He boasted that Obelisk was written by Houwu Chen, a developer who had worked on Ethereum, the second-most popular cryptocurrency platform. He posted an academic paper written by Chen on the Skycoin Web site, claiming that it was a Skycoin white paper. But when Stephens reached out to Chen, he got no response. "We kept trying to chase people down to ask details, and it was slowly revealed it just . . . didn't exist," he told me. In a later discussion about technical details, a Skycoin "community manager" told coinholders that "it's too advanced to share" and that the company "can't trust the public with it." When pressed, Smietana wrote, of Chen, "He is a recluse, I doubt anyone can contact him or he would respond." Smietana eventually told me that Chen had taken a payment of a million Skycoins for his work on the white paper and then left the project. (Chen declined to comment, saying, "Just don't put my name in the article. That's my statement.") Stephens discovered that Obelisk had never been implemented. (Smietana now acknowledges this, but claims that the project has published some of Obelisk's code and used it in simulations.)

Skycoin's payments were fast, but only because transactions were processed on a single server, rather than on a decentralized network of computers. The server sat in the Shanghai office of Scott Freeman, the C.E.O. of the C2CX cryptocurrency

exchange. This also meant that, if Smietana wanted to, he could freeze transactions. "The big thing about a blockchain is it's supposed to be decentralized, and no single entity is supposed to be able to change it," Freeman told me. He added, of Skycoin's setup, "In a way, it makes you into a fraud." (Smietana claims that his power to freeze transactions was designed as a security measure.) Freeman said that he nagged Smietana about implementing Obelisk but that Smietana told him, "People don't really care. It's not worth it. We should spend our resources on other things." (Smietana denies this.)

Skycoin's Web site claimed that multiple payments were scrambled together to provide extra privacy, but this feature was never implemented in the Skycoin wallet. The pre-mined coins sat in virtual wallets under Smietana's sole control. (When pressed, Smietana claimed that he shared control of the coins with a secret group of advisers, but refused to give me their names.) When Stephens asked to see Skycoin's accounting books, Smietana explained that his girlfriend, Sarah, was in charge. Sarah told Stephens that the accounting was a work in progress. (Smietana denies directing Stephens to Sarah, and she denies being in charge of the project's accounting.) Everything seemed haphazard. Stephens was once paid from a bank account in Mauritius registered under a different name; many employees were paid in bitcoin or Skycoin.

In early February, 2018, a month after the CoinAgenda conference, Stephens booked a trip to Shanghai to see Smietana, determined to bring some order to Skycoin. One night, he had dinner with Smietana and members of a Chinese marketing team that Smietana had hired, at a steak house in Xuhui. As the dinner began, Smietana rose from his chair and launched into a rambling diatribe of conspiracy theories. For hours, he catalogued the hidden crimes of a class of global élites who controlled citizens through virtual reality, medical marijuana, and pornography. At some point, Stephens started recording Smietana on his phone. "We want to feminize the peasant population to make them more docile," Smietana says. "It's so they don't revolt."

Stephens told me, "I just became shell-shocked. What the fuck have I gotten myself into?" He had seen Smietana post conspiracy theories on Telegram before, but he figured it was a joke. In the weeks after the dinner, Stephens tried to warn some investors, but felt that they brushed him off: "They would be, like, 'Brandon is just doing his thing, and the value of the coin keeps going up.' "

Shortly after Stephens returned from Shanghai, a reporter named Tristan Greene published a scathing article about Skycoin on the Next Web, a technology-news Web site, condemning the company for pre-mining its coins. The Skyminer router was being sold for one bitcoin—worth about ten thousand dollars at the time—but Greene highlighted the fact that it was constructed from components worth about six hundred dollars. Customers got back the ninety-four-hundred-dollar difference, but it came in Skycoin, which still sold only on small exchanges, making it difficult to trade in quantity. (The software for the miners was also incomplete; users connecting to Skywire had no way to pay for the service. Smietana claims that this feature is still under development.) Stephens granted Greene an interview but couldn't persuade him of the project's legitimacy. Greene wrote, "Is it a scam? I'm 99 percent sure of it."

Skycoin went into full damage-control mode. The project had been running a black-ops marketing unit sometimes referred to as Shill Team Six, composed of users plucked from Telegram who specialized in manipulating attention on the Internet. The "shills" occasionally flooded 4chan and Reddit, keeping engagement up with memes and bots. A former member of Skycoin's inner circle, who also requested anonymity, told me that if someone spoke ill of Skycoin the shills could be sent in to "make their life difficult," by digging up embarrassing information. (Smietana denied directing the group, saying it was "completely out of control.") The shills found that even bad publicity could be good for Skycoin. In a chat with investors, Smietana said that they sometimes spread negative rumors about Skycoin, in order to attract attention. "Direct promotion does not get to front page and has low click rate," he wrote. "If they create contravesy, then it directs

attention and clicks to skycoin." (Smietana claimed that these messages were
taken out of context.)

Stephens knew that Smietana pored over texts about crowd psychology and even
solicited advice from DJ Hives, an anonymous online personality who at one
point used a Hitler avatar, on controlling public opinion. In voice messages, DJ
Hives referred to Skycoin customers as "fish," a poker term for easily exploited
players, and encouraged Smietana to cultivate an aura of infallibility: "We want to
put you on the level of deity as far as the masses are concerned." (When contacted
on Telegram, DJ Hives said, "None of this is correct," and declined to comment
further.)

The team gamed search algorithms into ignoring Greene's article. "We helped
bury that page for a while," Sudo, the anonymous user, who claimed to be part of
Shill Team Six, messaged me on Telegram. (Smietana claimed that Skycoin
ignored the article.) But word was already spreading. Skeptics showed up in
Skycoin's social-media channels to ask questions, and Skycoin moderators started
blocking them. "After banning enough losers, everyone left will be winners,"
Smietana wrote. Skycoin enthusiasts smeared Greene on Telegram, accusing him
of writing a paid hit piece. When Greene showed up in the channel to address
their concerns, moderators kicked him out. Someone claiming to be a Skycoin
investor e-mailed Greene and threatened to "visit" him, his wife, and their son if
he didn't stop "messing" with Skycoin, writing, "nothing is really impossible in the
world for people like us that grew theire wealth on crypto."

Stephens contacted Michael Terpin, the adviser, to voice his worries, but, he said,
"It turns out Terpin didn't give a shit." (Terpin told me that, by this time, his
company was phasing out its involvement with Skycoin. "Brandon's got a flair for
the dramatic," he said. "Honestly, that's one reason I found it difficult to keep
working with Skycoin.") Stephens came up with a plan to strip Smietana of power
and transfer management of the company to a foundation; he still believed that

Skycoin could become a reality if reasonable people were in charge. But, by late February, 2018, six weeks after he joined the project, he found that he was locked out of both the Skycoin Telegram and his work e-mail. Members of his team were

locked out, too. "The whole thing was so terrible," Chat, from the marketing team, told me. Smietana sent an e-mail to the Next Web denying that Stephens represented Skycoin. "The person you interviewed has nothing to do with Skycoin and is a known scammer," Smietana wrote. "Please update the article." Stephens heard from Smietana again in June, 2018, when Smietana sent him a mysterious Facebook message in which he claimed that he had acted out of concern for Stephens's safety. "I saved your life. You do not even know," Smietana wrote. "I will tell you in a few years."

In July, 2018, a recording leaked of Li Xiaolai, a Chinese billionaire and the founder of a coin that launched with an eighty-two-million-dollar token sale, giving his unfiltered perspective on the industry. "From the start, I knew one thing," he said. "The main power to compete here is the traffic." Successful coins accrue value, in other words, not because of technical sophistication but because they get people's attention. This requires having a founder who can capture the imagination. "All the successful 100X, 1000X projects—you go and look at the founder, they will definitely be a spin doctor," he said. What matters with a coin is that people are talking about it. "The consensus of idiots is still consensus," he said.

To some extent, this is true of most modern currencies: they have no value apart from what we collectively assign them. But the U.S. dollar is supported by government guarantees and controlled through monetary policies. Bitcoin abolished government backing, but its scarcity is regulated through algorithms. (Even so, a tweet or statement from a high-profile coinholder like Elon Musk can raise or crash its price.) Coins that are manually distributed in token sales provide even fewer assurances. It is often impossible to know how many are in circulation. Their value is built on a promise that some feature, often still in development, will

make them more useful than other currencies. Until that promise is fulfilled, it is largely a matter of faith. "Money is a social construct," Smietana wrote, on

Telegram. "It is based upon CONFIDENCE . . . Confidence is a religion and is built upon perception and not reality."

Founders that control perception control the price of their coin. According to Chwierut, the blockchain researcher, during the I.C.O. bubble, it was not uncommon for founders to spend as much as thirty per cent of their budget on ad campaigns. Some of the effort went to gaming the attention economy, requesting mentions from influencers or using bots to create an illusion of broad support. Traders can even use these metrics to manage their portfolios: IntoTheBlock, a "crypto-intelligence" firm, tracks Twitter mentions and Telegram-member counts and sells the information to investors; a data platform called Santiment alerts users when chatter about their coins surges. Recommendation algorithms can encourage the spread of incendiary content, and coins promoted with controversy and falsehood often perform well. Some coin promoters use stunts or scandals to keep users engaged. After closing a fifty-million-dollar token sale, the founder of a cryptocurrency called Savedroid posted a picture of himself at what looked like an airport with a caption reading "Thanks guys! Over and out," which was taken as a confession that he was running off with the funds. A day later, he revealed that he was trolling about escaping with the money, but only after several articles had been written about the scandal. The firm ASKfm hired mountaineers to climb Mt. Everest and film themselves leaving a cryptocurrency wallet on its peak. (The company released a statement saying, "On a market where launching a blockchain endeavor is not really a newsbreak, companies have to stand out.") A sherpa died in the process.

Market manipulation is rampant. In schemes called "pump and dumps," traders meet in exclusive chat rooms where they coördinate to purchase a coin, causing the trading volume to go up and others to take interest. When the price is at its

highest, the pump-and-dumpers sell, leaving faithful users holding the bag. In an industry where everyone is a coinholder, there is no one left to pull the alarm. Should investors realize that their coin is a sham, it would be an act of self-

sabotage to raise concerns. Better to become evangelists, wooing others in order to boost the price.

U.S. law generally requires projects to register with the S.E.C., forcing them to make financial disclosures that investors could then inspect before buying. Almost none do, giving convoluted rationales that John Reed Stark, the founder of the S.E.C.'s Internet-enforcement office, told me are "poppycock." Not registering can facilitate further rule-breaking, as when, say, influencers promote coins without disclosing their investment, or projects pump coins with fraudulent claims. Stark said, of I.C.O.s, "Every single one I ever saw was unlawful on multiple levels." The S.E.C. began cracking down in 2017, but prosecution often requires "extraordinary resources from an alphabet soup of federal and state law-enforcement agencies," Stark said. As a result, few projects face consequences.

In the spring of 2018, Skycoin climbed into the list of the top hundred coins, and appeared on a Nasdaq Web cast. That May, Binance announced that it would list Skycoin on its trading platform. Around the time of the listing, the price jumped thirty-eight per cent. Then, suddenly, it came crashing down. According to several people involved, Skycoin privately sold to investors at a steep discount—in at least one case, coins worth millions of dollars—inadvertently giving them an incentive to dump it on the market as soon as they could. (Smietana denied being involved in such sales.) Smietana had claimed on Telegram that the investors were restricted from selling. But, as soon as Binance listed Skycoin, the market flooded with sell orders. Freeman, from the C2CX exchange, had been acting as the project's primary "market maker," using a pool of reserves to provide market liquidity and stabilize prices. "I tried to hold at about twenty," he told me. But the sell-off was too much to contain. Coinholders shared their misery on Telegram. "Its been fun guys, i'm gonns hang myself in 2 hours," a

user named Willy Jr. wrote. "Bought 20K at 20 dollars." A user named Dante wrote, "synth told me this shit would moon," adding, "i took a mortage on my house."

A few weeks into the sell-off, a voice message from Smietana emerged on Telegram that seemed to imply that the biggest Skycoin investors were coördinating their moves in a secret chat room. Smietana said in the message, of the investors, "Everyone was basically doing the exact opposite of whatever the public was doing." (Smietana acknowledged being in the chat room at one point but claimed that he was barely involved.) Rumor spread that the S.E.C. would investigate Skycoin as a result, and that Binance was considering delisting it. In the public chat, coinholders prepared for a death spiral. A user called Opaque wrote, "I want to say calm down guys, but its really doesnt look good."

Then, out of nowhere, Smietana announced that he had big news to share once "all the staff are safe." In the coming days, he accused members of the Chinese marketing team of breaking into his house with five gang members, holding him and his girlfriend hostage for six hours, beating him until one of his ribs broke, and stealing a small quantity of cryptocurrency. Members of the Chinese marketing team denied this. In a letter to investors, they claimed that Smietana and his girlfriend had pushed them out, refused to pay them, and frozen their Skycoin wallets, which contained coins that were then worth somewhere between four and nine million dollars. This was the first apparent instance of Smietana's using his power to freeze Skycoin transactions. (Smietana claims that the wallets contained embezzled company funds.) In their letter, the marketing-team members claimed that they had been invited to Smietana's apartment to find a resolution, and a small scuffle broke out in which he got a bruised wrist. Afterward, Smietana's girlfriend filed a police report, and four defendants spent a few months in detention, after admitting to detaining Smietana and his girlfriend in an incident that left them "lightly" injured.

Smietana blitzed Telegram with messages about the alleged "kidnapping." "This

is the best thing that has ever happened to Skycoin. Ever...As long as we can keep this drama going, we can get [the trading volume] even higher." He amused himself by plotting new distractions: "Quick, someone photoshop video of me

being beheaded by ISIS and see if you can get them to write an article about it." But coinholders seemed not to buy it. When he did a live YouTube interview, shortly after the incident, someone commented, "I dont see one bruise on his face. beaten the shit out of me, what with ? a piece of toast.?" As the sell-off continued, Smietana blamed it on the "kidnappers" for dumping their stolen coins. "They have been surpressing the price the whole time," he wrote.

In November, 2018, Smietana, apparently growing desperate, enlisted John McAfee to promote the coin. McAfee, once famous for the antivirus software that he developed in the eighties, had earned a reputation as a kind of cyber outlaw: he was a "person of interest" in a murder in Belize, in 2012, and subsequently fled the country, later posting images of himself cruising the Caribbean in his yacht, brandishing guns. He was a sought-after crypto promoter. McAfee tweeted a video that seemed to show him with the Skycoin logo freshly tattooed on his back and the message, "Why Skycoin? If you have to ask, you've been living in a fucking closet." (Smietana admitted to paying McAfee during this period but insisted that it was a gift to help with "yacht repairs.") Smietana urged people to buy: "If you put in a million dollars now, and we have a run just as large as the last one, you're going to be at fifty million dollars," he said, in a video. Then, in March, 2019, McAfee publicly broke ties with Skycoin. (Smietana told me that McAfee began demanding large fees that he refused to pay.) When asked on Twitter what he would do about the tattoo, McAfee replied, "I'll keep it as a reminder that no matter how old I get, I still get scammed by unscrupulous people with pie in the sky plans. They almost drove me to violence."

Stephens, watching from afar, felt that he had been spared the worst. He hadn't behaved perfectly: he had been taken in by Skycoin's promise, but he also promoted a coin that he knew little about. After being cut off, he took Skycoin's

social-media accounts hostage, and unsuccessfully demanded a severance payment. In the end, he told me, he sold his holdings for thirty thousand dollars. The internal drama and crashing prices prompted a broader exodus from the project. In 2019, Freeman's exchange announced that it was delisting Skycoin. Michael Terpin's name still appears on the Skycoin Web site, but he told me that he no longer has anything to do with it. Josh, the cryptocurrency investor, lost faith after visiting Smietana in China, last year. "Crypto is a bunch of con artists conning each other," he said. "Obelisk was always a week away, and it still is." He sold his holdings and told me that he lost ninety-nine per cent of his investment.

Investors who sold at the peak would have made large profits, but many average coinholders suffered. (Smietana claimed that he urged restraint: "I told people not to put money into the market that they were not prepared to lose.") Armon Koochek, a recent college graduate in Santa Barbara, California, invested in Skycoin in 2018, lured by the promise of a new Internet and excited by the "memes and content on Reddit and Twitter." He lost some fifteen thousand dollars. He tried to warn others away from the project in the Telegram chat room, and was soon banned. "I hope I saved a lot of investors," he told me. Dael Lithgow, a forty-five-year-old bootmaker in Pietermaritzburg, South Africa, invested most of his savings in Skycoin in 2017, and convinced his mother and girlfriend to invest, as well. Had they sold during the boom, the profits would have been "life-changing," but they held on. "I really believed in what they were trying to do," he told me. Today their coins are nearly worthless.

In the summer of 2019, I met Smietana at a mozzarella bar in Manhattan. He was wearing all black, and his hair was starting to gray. As we sat, he warned me, unprompted, "Honestly, like, ninety-eight per cent of the people are scammers in blockchain." Then, preëmpting my questions, he visited every bit of Skycoin intrigue. The "gang members" who kidnapped him in China had demanded "sixty million dollars." The technology for Skywire, the decentralized Internet service, was already "working" and Obelisk was just "a few months" out.

His girlfriend, Sarah, called several times while we were speaking. He showed me frantic messages from her, and said that he was blowing off an important meeting,

but he kept talking, telling me about his coin's promise. He seemed to regard me as the next potential pump.

Almost four hours into my lunch, I made an excuse to leave, saying that I needed to walk to my bank. Smietana followed along for almost thirty blocks, ranting about his court case in China. Eventually, I brought him to Times Square, where his girlfriend was waiting. She must have seen something in my eyes, and said, "He's a mad scientist." After New York, they were headed to the Caribbean, where they would see Terpin and check out the crypto scene. They invited me to join. In the months that followed, Skycoin's price dropped below a dollar a coin, but Smietana remained optimistic. He told me, on Telegram, that he had a new hardware lab where he was developing antennae for the Skyminer, and said that Skycoin was moving into the medical industry, agricultural automation, and underground mining.

When I confronted Smietana about Skycoin's history, he began sending me dozens of voice messages a day, spinning elaborate stories that often contradicted one another. Many could be corroborated only by people whom he swore existed but who couldn't talk because they had government security clearance, or were in hiding, or because he didn't know their real names. He attacked those who spoke ill of Skycoin, calling them criminals, junkies, and blackmailers. He claimed at first that he didn't know Stephens ("I contacted advisor board and no one involved in Skycoin has heard of Bradford"), then that he was a "con artist," then that he was a "federal informant/agent" trying to entrap him. At one point, Smietana even suggested that he wasn't the real founder of Skycoin. I began to feel dizzy reporting this story, trying to sort through the layers of deception and to figure out whom I could trust. Everyone seemed to think that they could spin what I wrote to their advantage.

Smietana continues to post in the Telegram chat room, assuring loyal coinholders that the features they've waited years for are almost complete. "In that Telegram group, he is king," the former member of Skycoin's inner circle told me. Former employees remain divided about Smietana's motives. "It's almost as if he viewed Skycoin as a money printer," the former marketing contractor told me. "Everything that happened was a distraction or ruse to keep people in the dark while he kept his shit-coin casino operating." It's impossible to know how much Smietana made on the currency. ("Overall, I would say, I did ok," Smietana wrote to me.) But other founders have pulled "exit scams," dumping all of their coins at the market's height and disappearing entirely, which Smietana never did. One of Skycoin's lead software developers—who was also Smietana's friend from college, and who requested anonymity out of fear of harassment—doesn't think Smietana was in it to get rich: "Being a figurehead in blockchain is like being a cult leader and I think he enjoyed that more than the money." At one point, Smietana sent me a voice message, asking, "Why didn't I just take the seventy million and just, like, run off?"

In the past several years, the S.E.C. has charged multiple I.C.O. operators with offering unregistered securities and committing fraud, and the cases have resulted in settlements that have ordered hundreds of millions of dollars returned to coinholders. Last July, Jack Abramoff, who became famous, in 2006, for his role in a political-lobbying scheme, pleaded guilty to committing securities fraud with a token sale. The project, called AML BitCoin, published a white paper in 2017 that listed Smietana as one of its software developers. (Smietana claims that he was included without his consent.) In October, Spanish authorities arrested McAfee on an extradition request from the U.S., where he faced charges of tax evasion and illegally promoting cryptocurrencies. (In June, he was found dead in his jail cell, in an apparent suicide.) In the past few years, cryptocurrency founders have tweaked their strategies; instead of I.C.O.s, they now hold "initial exchange offerings" and "initial decentralized exchange offerings." Stark, the former S.E.C. official, told me that the new terminology is "designed to create confusion and

avoid S.E.C. scrutiny, but all of it is the same." David Silver, a lawyer who represents victims of cryptocurrency fraud, hopes that, as the S.E.C. enforces

securities laws, fraud in the market will decrease. "Yesterday's crypto heroes are tomorrow's crypto felons," he said. "The statute of limitations is very long."

This past January, a Telegram channel named after WallStreetBets, the Reddit forum that supercharged GameStop's stock price, targeted Skycoin with a pumping campaign. As the pump spread to other social-media platforms, the price punched up above five dollars per coin. The mood in the chat was ecstatic. "I'm frantically moving funds around to buy more," a user named Krzys P wrote. Smietana wrote, "MOON MOON LAMBO MOON." Stephens is now a software developer at Salesforce, and insists that he is done with cryptocurrency: "My personality is not well suited to fraud, and mafioso, and everything that crypto is." He recently returned with his wife to Japan and sought out a new Shinto shrine where, he said, he wished for good health.

# NEW YORKER FAVORITES

- What happens when a bad-tempered, distractible doofus runs an empire?
- Remembering the murder you did not commit.
- The repressive, authoritarian soul of Thomas the Tank Engine.
- The mystery of people who speak dozens of languages.
- Margaret Atwood, the prophet of dystopia.
- The many faces of women who identify as witches.
- Sign up for our daily newsletter to receive the best stories from *The New Yorker*.

---

*Morgen Peck is a freelance journalist who has covered cryptocurrency since 2012.*

More: Cryptocurrency    Bitcoin    Entrepreneurs    Fraud    Money    Technology

# THE DAILY

The best of *The New Yorker*, every day, in your in-box, plus occasional alerts when we publish major stories.

**E-mail address**

Your e-mail address

Sign up

By signing up, you agree to our User Agreement and Privacy Policy & Cookie Statement.

Read More

ON-AND-OFF-THE-AVENUE

# A GUIDE TO GETTING RID OF ALMOST EVERYTHING

Once you've thanked and said goodbye to the items that do not spark joy, what can you do with them?

**By Patricia Marx**

BOOKS

# HOW PUTIN'S OLIGARCHS BOUGHT LONDON

From banking to boarding schools, the British establishment has long been at their service, discretion guaranteed.

**By Patrick Radden Keefe**

Cookies Settings

THE MISEDUCATION OF MARIA MONTESSORI

Her method was meant for the public. Then it became a privilege.

**By Jessica Winter**

DISPATCHES

DISPATCHES

THE RUSSIANS FLEEING PUTIN'S WARTIME CRACKDOWN

Resisters are leaving Russia because the country they worked to build is disappearing—and the more people who leave, the faster it vanishes.

**By Masha Gessen**

# **Altcoins**

Alternate cryptocurrencies - bitcoin alternatives

- **Home**
- **Altcoin Exchange** »
- **Online Miners**
- **Bitcoin Faucet**
- **Tracking**
- **Scamcoins**
- **News** »

## Scamcoins

Beware of **scamcoins**! Premine, instamine, hidden launch – those coins were created in "get rich quick" scheme in order to make money only by their creators and small group involved in instamine or premine.
Do not use these coins, let them fall into limbo. Using them it's waste of your time and CPU/GPU power.

## List of scamcoins – do not use:

- PXC Phenixcoin: premined 1,000,000 coins

- BTB Bitbar – premined by small group of coin creators

- MNC Mincoin – started with no binaries and 25000% reward blocks

- GLD Goldcoin – 2000% superblocks at start (3.2% instamine)

- AMC Americancoin- premined with 6.5k-14k blocks giving zero reward

- LKY LuckyCoin – superblocks at start, random superblocks

- MEM MEMEcoin – premined, superblocks

- ARG Argentum – premined

- StableCoin – 1,200,000 premined

- NUG Nuggets – premined

- CDC Cloudcoin- 1,000,000 premined, random blocks

- CENT Pennies – hidden launch

- **SYC Skycoin – premined**
- CL Copperlark – massively premined
- NAN NanoTokens – premined
- MST MasterCoin – premined
- USC UScoin – premined
- GIL – premined
- RCH RichCoin – premined
- XNC XenCoin – premined
- REC RealCoin – premined
- RED Recoin – 1,000,000 premined
- ALF Alphacoin – premined
- One Last Coin – premined
- ORB Orbitcoin – 66% premined
- NUC Nucoin – premined

Source: *xorxor's list of all cryptocurrencies at bitcointalk forum.*

# EXHIBIT C

The media is retarded. They are still writing articles about the "insider trading" of cat memes, fake news.

Quick, someone photoshop video of me being beheaded by ISIS and see if you can get them to write an article about it. "Kittycash CEO beheaded by ISIS after SEC investigation".

edited 2:50 PM ✓✓

# EXHIBIT D



**Deleted Account**  Reply
> **Deleted Account**
> 100000 sky club?
@skycoinstrading  11:10 AM

**Deleted Account**
> **Deleted Account**
> @skycoinstrading
thanks 😉  11:10 AM

**Deleted Account**
> **Deleted Account**
> @skycoinstrading
Is that where we do the insider trading  11:10 AM

**Secret Island**
Holy jesus. I've spent too much time in this padded room to notice. Sky is in the $6 range! Muahahahahahahaaaaaa  11:11 AM

**Deleted Account**
we have a new insider group  11:11 AM

need to join @KittyCash and find the new insider group link  11:11 AM  123

**Secret Island**
Can I join please? You can have my wife  11:11 AM

22

**Deleted Account**
> **Deleted Account**
> need to join @KittyCa...
Join everyone  11:11 AM

Maior ann soon  11:11 AM



**Synth**
Photo

Omg. The fake news articles about the SEC insider trading investigation are real.

The SEC is coming for your kitties. edited 8:46 PM ✓✓

**Deleted Account**   Reply
| Synth
| Omg. The fake news articles ab...

did people even read that   8:47 PM

its from feb 30th   8:47 PM

thats not a day   8:47 PM

**Deleted Account**
Jan 32???   8:47 PM

LOL   8:47 PM

**TraderNJ | WILL NOT ASK YOU FOR MONEY**
| Deleted Account
| its from feb 30th

lmfaoooooooo   8:47 PM

hahaha   8:47 PM

123
♡

22
@

⌄

01:16, 288.1 KB    11:45 PM ✓✓

00:01, 7.8 KB    11:45 PM ✓✓

**Anosis .**
True    11:45 PM

Good for us though    11:45 PM

^^^ INSIDER TRADING SECRETS    11:45 PM ✓✓

**Anosis .**
Less whales    11:45 PM



**Anosis .**
Synth
^^^ INSIDER TRADING SECRETS

You're troll is amazing haha    11:46 PM



**Deleted Account**                                    Reply
The "insider" group is just a swap meet for memes, lol.   8:22 AM

**Deleted Account**                                    Reply
> **Deleted Account**
> I'm new to skycoin. What's all the fud about?

Sarcastic voice message was distorted and taking out of context. A group with cat memes is now being called an insider trading group
8:23 AM

# EXHIBIT E

Official Annoucement: (Sudo, dont delete this)

Skycoin staff were alerted to large coin balances that were being dumped and driving down the price. We investigated and found the coins originated from distribution wallets so the theft was internal and eventually traced the stolen coins to the Chinese marketing team (who was doing invoice fraud).

We hired an accountant and they found even more theft and fraud, even lying about employee salaries and skimming the money. We even found the managers of the marketing team stealing the Skycoin bonuses of the employees.

We confronted the marketing team about the theft and they were unapologetic and felt entitled to the stole money. One of them said "When you eat at the restaurant and you order vegetables, you do not ask how much the restraunt paid for the vegetables". The marketing team also said "We work for ourselves, not for Skycoin", despite being on salary.

As soon as the marketing team knew we were aware of the stolen coins, they immediately began massive dumping of the stolen coins.

Steve secretly intiated a hard fork to freeze the stolen coins and end the dumping, to protect the Skycoin investors until we could determine the situation.

After Steve froze the coins, they showed up with 9 people and 5 gang members to my home and kidnapped and threanted me ("Give us 10,000 Bitcoin or we will kill you.") and held me hostage for over 8 hours.

After the kidnapping we unlocked the coins until all Skycon staff were safe.

Then the thieves started massive dumping of previously stolen

Steve secretly intiated a hard fork to freeze the stolen coins and end the dumping, to protect the Skycoin investors until we could determine the situation.

After Steve froze the coins, they showed up with 9 people and 5 gang members to my home and kidnapped and threanted me ("Give us 10,000 Bitcoin or we will kill you.") and held me hostage for over 8 hours.

After the kidnapping we unlocked the coins until all Skycon staff were safe.

Then the thieves started massive dumping of previously stolen coins on the market.

After all the staff are safe, the accounts with the stolen funds were frozen on the exchanges.

We will be releasing an official press release soon and may do detailed interview about the situation, how it was detected and about how we have changed policies to improve in the future.

Everyone is safe now. We actually did pretty well on the market too. Even during the dump if the stolen coins we had an an early investor sell over 100,000 coins over a day and price did not even drop.

So I am confident the price will recover and spring back quickly

However there is still danger to the Skycoin staff and we are dealing with it. 2:25 PM

This is my official announcement 2:25 PM

and the other official announcement is coming in a few hours 2:26 PM

# EXHIBIT F


  
Today

 **Pumpolito**                                    edited 03:05
Hello.

I saw you asked for some Informations about Bradford and Morgen Peck.

Bounty for any information about the events leading up to the Skycoin delisting on Binance and the activities of Sudo/Bradford.

And bounty for any information about ongoing blackmail and extortion operations against Skycoin and its community.

Dm @haltingstate

**Pumpolito**                                                        03:16
I was hidden for the last 4 years.
But I think Bradford did go to far now.

The Binance delist and most of these attacks are from Bradford and     edited 03:18
people who got paid by Bradford or should I say paid Bradford and Scott.
Bradford run out of money and Scott helped him out with money.

I don't understand why, but they spent a ton of money for social media  03:26
attacks. Most of these people are from 3. world country's, cause they do
everything for money.

This guy named Blevenec got hired for this negative stuff too after they saw
he won the trust from the Skycoin Community.

They paid around 50 people from 3. World country's for 7 Month,          edited 03:29
spamming the Binance Support with false Informations about Skycoin
and forwarded messages out of context from your Telegram Account.

But after Bradford realised Binance can't be fooled, by a couple of 3.   edited 03:32
World country humans. He was looking for a young "Journalist" who
wanted to write a fake Article about Skycoin and found Morgen Peck.

 **Pumpolito**                                    edited 03:42
Morgen Peck got paid and fooled by Bradford and got many false Informations
from him too.

Bradford gave Morgen Peck many false promises.

 **Pumpolito**                                           04:01
I go to bed now. If you want/need more informations, you can write me
tomorrow.

I can even try to restore my old phones to get a couple of Screenshots and
pictures.
I was just lurking in one of Bradford's Insider FUD Groups, but got kicked out
1-2 weeks after the shit article got released. Cause I told him this was to much
now and he needs to chill.
Cause all this hate and effort to destroy Skycoin is dumb and useless.




Cause he posted under your Facebook post 8 years
ago.
But this guy don't even know how to spell coding.

 **Synth**                                        ✓✓ 12:09

>  **Pumpolito**
> This was the reason everyone believed Bradford that he was always in...

He used this facebook post, to claim that he was involved with Skycoin 8 years
ago?

 **Pumpolito**                                     12:10



The Vip Party in 2018 with hookers and cocain.

But I think you already know this picture from him,
or?

 **Synth**                                        ✓✓ 12:10
Yes.

 **Pumpolito**                                     12:13

> **Synth**
> He used this facebook post, to claim that he was involved with Skycoin 8 year...

Yes and he told you and him are good friends since school etc. and you two
build Skycoin together. It's complete bullshit, but some belived it. Morgen Peck
belived it too.

Bradford told Morgen too, that her carrier will get a huge boost with this Skycoin
Saga Article and that he will become some sort of "PR-Manager" for her too and
that this will be the first step for Peck for a big carrier as Journalist in the crypto
space...

 **Synth**                                       ✓✓ 12:13
Bradford was unable to pay you?

He owed you money and refused to pay or said he was unable to pay?

What date did he stop paying you, approximately, the month and year.   edited ✓✓ 12:14


  
 **Synth**  edited ✓✓ 10:51
Thank you. Yes. I can send you a bounty for this. Also, Pleae send 4 skycoin addresses for the bounty.

And up to 10k if you can provide photos or screenshots from old phone.

I will send more questions later. I appreciate it.

What you said. Actually, another member of Sudos team said.  ✓✓ 10:53

However we only knew that he had 8 full time people attacking us.

We didnt know he hired 50 people. Probably contractors or pay by post, but I am not surprised. I saw how bad their english was and suspected this.

1. You worked on Sudos team? I remember seeing you a few years ago.  edited ✓✓ 10:57

2. Was Bradford in the room?

3. They were funded by Scott? Was Bradford the one who solicited the money from Scott?

4. When did they stop paying Sudo?

5. We knew that Scott funded Bradford and that he was working with Sudo. Other persons already told us that. But thank you for confirming

6. What did you do personally on their team? What kind of things did they ask you to do?

 **Synth**  ✓✓ 11:08
You think that Bradford ran out of money, so he went to Scott and Scott paid him full time to harass and extort Skycoin?

They were demanding we pay them 50 Bitcoin or they would get us delisted from Binance.

 **Pumpolito**  11:37
| **Synth**
| Thank you. Yes. I can send you a bounty for this. Also, Pleae send 4 skycoin a...

aX5LWk6iFNBQT7wBfGaiMAiVBvE7veDzYz

Z6TDNnjuCimZVkhnpoPJnWxPgNweKgosFz

n9DipsZokb4a7UG4mxnTvJVbxUGUcgtGr7

PgoFcZT1eD5MnKF4SkstiFPDN2gbrxthJv

 **Pumpolito**  11:39
| **Synth**
| What you said. Actually, another member of Sudos team said.  However we o...




However we only knew that he had 8 full time people attacking us.

We didnt know he hired 50 people. Probably contractors or pay by post, but I am not surprised. I saw how bad their english was and suspected this.

1. You worked on Sudos team? I remember seeing you a few years ago.                                                    edited ✓✓ 10:57

2. Was Bradford in the room?

3. They were funded by Scott? Was Bradford the one who solicited the money from Scott?

4. When did they stop paying Sudo?

5. We knew that Scott funded Bradford and that he was working with Sudo. Other persons already told us that. But thank you for confirming

6. What did you do personally on their team? What kind of things did they ask you to do?

 **Synth**                                                                                         ✓✓ 11:08
You think that Bradford ran out of money, so he went to Scott and Scott paid him full time to harass and extort Skycoin?

They were demanding we pay them 50 Bitcoin or they would get us delisted from Binance.

 **Pumpolito**                                                                                    11:37
┃ **Synth**
┃ Thank you. Yes. I can send you a bounty for this. Also, Pleae send 4 skycoin a...

aX5LWk6iFNBQT7wBfGaiMAiVBvE7veDzYz

Z6TDNnjuCimZVkhnpoPJnWxPgNweKgosFz

n9DipsZokb4a7UG4mxnTvJVbxUGUcgtGr7

PgoFcZT1eD5MnKF4SkstiFPDN2gbrxthJv

 **Pumpolito**                                                                                    11:39
┃ **Synth**
┃ What you said. Actually, another member of Sudos team said.  However we o...
Yes, these 3. world country people got paid by Bradford per post/ per message to the Binance Support Team. Oh really, who is opening up now too?

 **Synth**                                                                                         ✓✓ 11:46
┃ **Pumpolito**
┃ Yes, these 3. world country people got paid by Bradford per post/ per messag...
We had a lot of people over last two years. Even sudo himself told me some of this.


 
 **Pumpolito**                                              12:05

> **Synth**
> 1. You worked on Sudos team? I remember seeing you a few years ago.  2. Wa...

1. No, I got paid a little bit and worked mostly for Bradford, that's why I know he run out of money, cause he could not pay me aprox. 1.5 years ago now. I was in some groups with Sudo, but I was just lurking most of the time and was not really in Sudos Team.

2. In which room? If you mean Sudos Telegramm rooms then yes. In 1 room he was, in another he wasn't. But I was only in 2 sudo rooms personally idk. How much more private rooms sudo got. Bradford got private rooms too without sudo.

3. Yes Bradford asked Scott for money, cause he had not enough for his normal Lifestyle and paying Attackers at the same time and Bradford wanted desperately to destroy Skycoin. So most of the money people got paid the last 1.5 years is probally from Scott.

4. Well, most people don't got paid 1.5 years ago for 2 Month, I don't know if they completely stopped paying sudo now or not. I did not had much contact with sudo. I was just accepted in his groups cause Bradford said it.

6. I did not do that much, cause I had a normal full time Job too. I only wrote a couple of messages these 3. World country guys could sent to the Binance Support or told them what to say when they enter the Skycoin Telegram and Twitter.
Bradford's plan was to distract you and the Skycoin team with all this attacks so much that you can't work normally, give you a bad reputation that no one works for you anymore and keep you and everyone busy in the Social Media channels and when you got angry from these people and you sent an insulting message to them, they saved it and wrote another E-mail to the Binance support or spammed it on social Media or to "Journalist" like ForkLog. Idk if you saw the Screenshot from the ForkLog Interview. But that happened too, cause everyone spammed their "Journalist" with E-Mails. I was accepted in his Groups, but I did not do much. He just told me to handle all this messages and question from these 3. World country guys and sent him the most important things they did.


**Synth** ✓✓ 12:17

>  **Pumpolito**
> This was the reason everyone believed Bradford that he was always in S...

Did Bradford begin to make the claim that he was Skycoin's "lead developer" in 2021 or he was making that claim earlier? When did he start making this claim and who did he say this to?

I only heard that he was calling himself Skycoin's "secret lead developer" in 2021. That was the first time I heard that he had said this.

Bradford never did any programming or software development work for Skycoin. He is not on the github at all.

**Pumpolito** 12:19

> **Synth**
> Bradford was unable to pay you? He owed you money and refused to pay or s...

Yes he was unable to pay me for 2 Month.

He said he was unable to pay, but he will try his best to get funding again. So he asked Scott and other people again for more money to destroy SKY.

It was around August/September 2020.

**Pumpolito** 12:22

> **Synth**
> I only met Bradford two times in person. Once for less than an hour. I did not...

Ye, he told everyone that you and him close friends since school. Idk. that was always a little bit weird to me. He came up with many dumb story's, that made no sense at all.

**Synth** ✓✓ 12:26

Thank you. These details help a lot.

**Pumpolito** 12:26

> **Synth**
> Did Bradford begin to make the claim that he was Skycoin's "lead developer"...

He was making that claim earlier, first time I heard it was end 2019. When he "hired" new attackers, he came up with a dumb story, that you betrayed him and stole the Skycoin master seed with the 75 million coins and changed it and that you stole his Skycoin project from him. Cause he was the lead developer etc.
He told everyone, that he just want to get back his Skycoin Project and that you are the devil in person, cause you betrayed and stole it from an old good friend.

**Synth** edited ✓✓ 12:27

> **Pumpolito**
> He was making that claim earlier, first time I heard it was end 2019. When he...

Did Bradford even say say that he wanted to "steal Skycoin back" or any other statements about trying to take Skycoin back or steal the company?


  

 **Pumpolito**                                                                04:01
I go to bed now. If you want/need more informations, you can write me tomorrow.

I can even try to restore my old phones to get a couple of Screenshots and pictures.
I was just lurking in one of Bradford's Insider FUD Groups, but got kicked out 1-2 weeks after the shit article got released. Cause I told him this was to much now and he needs to chill.
Cause all this hate and effort to destroy Skycoin is dumb and useless.

 **Pumpolito**                                                      edited 04:09
> **Pumpolito**
> They paid around 50 people from 3. World country's for 7 Month, spamming...

I never thought that this article could delist Skycoin from Binance.

But after the article got released he told these aprox. 50, 3. World country Humans to spam this Article to the Binance support and then Binance acted on it and asked Morgen Peck for more Informations about Skycoin and Bradford spoonfed Morgen Peck with the Informations she have to say to the Binance support.

Bradford told her so much lies and shit that Binance seriously believed him and didn't even asked the Skycoin team for explanations. They just delisted SKY straight up, without even listening to the Skycoin Team... They just got fooled and scammed by the biggest scammer Bradford too. It's insane how dumb Binance was.

 **Synth**                                                   edited ✓✓ 10:51
Thank you. Yes. I can send you a bounty for this. Also, Pleae send 4 skycoin addresses for the bounty.

And up to 10k if you can provide photos or screenshots from old phone.

I will send more questions later. I appreciate it.

What you said. Actually, another member of Sudos team said.                ✓✓ 10:53

However we only knew that he had 8 full time people attacking us.

We didnt know he hired 50 people. Probably contractors or pay by post, but I am not surprised. I saw how bad their english was and suspected this.

1. You worked on Sudos team? I remember seeing you a few years           edited ✓✓ 10:57
ago.

2. Was Bradford in the room?

3. They were funded by Scott? Was Bradford the one who solicited the money from Scott?

4. When did they stop paying Sudo?

