**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRANDON SMIETANA and SKYCOIN | ) | |
| GLOBAL FOUNDATION LIMITED, a | ) | |
| Singapore company, and SYMBOLIC | ) | |
| ANALYTICS INC. a Delaware Corporation, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 22 C 708 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| BRADFORD STEPHENS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiffs Brandon Smietana, Skycoin Global Foundation Limited ("Skycoin"), and

Symbolic Analytics Inc. ("Symbolic") created a cryptocurrency called the Skycoin Token, which

Skycoin sold on cryptocurrency exchanges. Plaintiffs bring this action against Defendants

Bradford Stephens, Aaron Kunstman, Harrison Gevirtz, Ryan Eagle, Far Ahead Marketing, LLC

("FAM"), Joel Wayne Cuthriell, Morgan Peck, Catherine Byerly, Steven Leonard, Joshua Ogle,

American Publishers, Inc., and unknown individuals and companies, alleging that they engaged

in a campaign of fraud, harassment, and extortion to interfere with Skycoin's business and to

obtain money from Plaintiffs. Plaintiffs have effectuated service on Defendants Stephens, Eagle,

Byerly, and FAM.[1]

In their second amended complaint, Plaintiffs bring claims against Stephens, Eagle,

Byerly, and FAM for misappropriation of trade secrets in violation of the Defend Trade Secrets

Act ("DTSA"), 18 U.S.C. § 1836(b); tortious interference with Skycoin's business; civil

conspiracy; and unjust enrichment. Plaintiffs also bring claims against Stephens for violation of

---

[1] Because Defendants Stephens, Eagle, Byerly, and FAM are the only defendants that have been served
and appeared in this case, the Court focuses only on Plaintiffs' claims against those Defendants.

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961; breach of contract; and violation of the Illinois Hate Crime Act ("IHCA"), 720 Ill. Comp. Stat. 5/12-7.1. Additionally, Plaintiffs bring claims for fraud against Stephens and Byerly. Finally, Plaintiffs bring a claim for breach of fiduciary duty against Stephens, Byerly, and FAM. Defendants Stephens, Eagle, and Byerly have each moved to dismiss Plaintiffs' second amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[2] Separately, FAM has moved to dismiss the second amended complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

Because Plaintiffs have not alleged that FAM had sufficient contacts with Illinois, the Court does not have jurisdiction over FAM and dismisses the second amended complaint as to FAM. Further, because Plaintiffs have failed to adequately allege that Stephens violated RICO, or that Stephens, Byerly, or Eagle violated the DTSA, the Court grants their motions to dismiss as to the RICO and DTSA claims. The Court dismisses the second amended complaint without prejudice and defers consideration of the state law claims until Plaintiffs plead a sufficient basis for subject matter jurisdiction.[3]

---

[2] Byerly initially moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Doc. 52. However, after initial discovery, she moved to withdraw her motion and to join Stephens' Rule 12(b)(6) motion, which this Court granted. Doc. 91.

[3] The remaining defendants have not filed appearances in this case. To the extent the arguments raised by Stephens, Eagle, and Byerly apply equally to the non-appearing defendants, the Court extends its decision to include all defendants because Plaintiffs had an adequate opportunity to respond to the arguments. *See Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 2011) (court may *sua sponte* enter judgment in favor of additional non-moving defendants if motion by one defendant is equally effective in barring claim against other defendants and plaintiff had adequate opportunity to respond to the motion); *Roberts v. Cendent Mortg. Corp.*, No. 1:11-CV-01438-JMS, 2013 WL 2467996, at *5 (S.D. Ind. June 7, 2013) (although the defendants had not entered appearances and it was not clear if they had been served, court could impute arguments made by one defendant to all defendants and dismiss claims against all of them).

## BACKGROUND[4]

In 2013, Skycoin introduced a cryptocurrency called the "Skycoin Token." Smietana is the Chief Software Architect and authorized representative of Skycoin and Symbolic. Skycoin created 100 million Skycoin Tokens, which were traded on various cryptocurrency exchanges. In January 2018, Skycoin Token reached its peak market capitalization at $5 billion.

## I.     Extortion, Fraud, and Interference with Skycoin's Business

On January 8, 2018, Plaintiffs engaged Stephens and Gevirtz to provide marketing services for Skycoin. Seeing an opportunity, Stephens and Gevirtz devised a plan to defraud, extort, and steal money and assets from Skycoin with the assistance of the other Defendants. Stephens represented himself as the owner of a marketing startup company called Smolder LLC. But unbeknownst to Plaintiffs, in 2014 the Federal Trade Commission ("FTC") obtained an order preventing Stephens and Gevirtz from engaging in certain marketing activity. Stephens and Gevirtz knew about the order but failed to inform Plaintiffs about the order and instead agreed to provide Plaintiffs with marketing services that violated the order. Plaintiffs made several payments to Stephens and Gevirtz, including an initial payment of $107,948 for the marketing services, $800,000 in Skycoin Tokens for an internet advertising campaign, $14,752.44 for work performed by Byerly, $38,000 to combat a third-party attack on Skycoin's website, $14,314 for Stephens and Gevirtz to attend a conference, and payments of $842,400, $121,337, $23,212, $80,929, $56,457, and $14,679 for various other marketing services.

---

[4] The Court takes the facts in the background section from Plaintiffs' second amended complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving the defendant's motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). On a Rule 12(b)(2) motion, the Court may also consider evidence submitted by a defendant opposing the Court's exercise of jurisdiction. *See Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). Therefore, the Court has reviewed FAM's declaration and accompanying exhibit, "accepting as true any facts contained [therein] that remain unrefuted by the plaintiff." *GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009).

During their relationship with Skycoin, Stephens, Gevirtz, and Byerly sought reimbursement for unauthorized charges that were not related to legitimate business activity. On one occasion, Stephens submitted an invoice for $50,000 for cash withdrawals he made in Las Vegas. He, however, refused to provide receipts and could not explain on what he had spent the money. Stephens, Gevirtz, and Byerly also all submitted bills for subcontractors for dates both before and after their relationship with Skycoin, as well as for subcontractors that did not exist. Stephens, Gevirtz, and Byerly all submitted bills for nonexistent costs or unapproved expenses and falsely represented to Skycoin that they had received prior approval.

Skycoin later learned that Stephens and Gevirtz were taking advantage of it. For instance, on January 12, 2018, Stephens and Byerly told Plaintiffs that an unknown third-party was attacking Skycoin by posting links to pornographic content on its website as an attempt to divert traffic from the website. Stephens and Gevirtz claimed that they needed an additional $38,000 to combat these attacks, which Skycoin paid. In February 2018, however, Skycoin learned that there had been no third-party attack. In fact, it was actually Stephens and Gevirtz themselves that instigated the attack so that they would receive more money. The attack damaged Skycoin's search engine optimization ("SEO") ranking and significantly reduced the traffic to Skycoin's website.

From late January through early February 2018, Stephens demanded that Skycoin pay him $100,000 per month to combat third-party attacks, eventually increasing his demand to $300,000 per month. In early February 2018, Symbolic received invoices that it deemed "highly suggestive of fraud" and discontinued future payments to Stephens and Gevirtz. Doc. 59 ¶ 50. On February 8, 2018, Gevirtz told Skycoin's IT staff that he controlled the third-party attacks

and that he could stop the attacks if Plaintiffs paid him the money he demanded. Plaintiffs did not pay the demands.

After Plaintiffs refused to pay the demands, in February 2018, Stephens, Gevirtz, and Smietana met in Shanghai, China, with Eagle attending via Zoom. During the meeting, they threatened to have Skycoin delisted from all cryptocurrency exchanges and to drive the price of Skycoin Tokens to $0 unless Smietana paid them $30,000,000 in Bitcoin as well as $1,000,000 in U.S. Dollars. Gevirtz also alluded to having connections to "organized crime cartels in Eastern Europe that would employ 'unconventional debt collection' methods should Smietana not accede to their demands." *Id.* ¶ 58. Stephens and Gevirtz also demanded that Stephens be named Chief Operating Officer and Gevirtz be named Chief Financial Officer of Skycoin. On February 9, 2018, in fear of the threats, Skycoin paid $127,000 to Stephens and Gevirtz. On February 22, 2018, after pressure from Skycoin's advisory board, Stephens and the other Defendants stopped providing marketing services for Skycoin. Plaintiffs requested a refund of any not yet spent prepayments they made for the marketing services, but Stephens and Gevirtz refused.

Around February 2018, Stephens and Gevritz also attempted to take over Skycoin through nefarious means. For instance, Stephens paid journalist Tristian Greene to publish an article titled "Skycoin: Anatomy of a cryptocurrency scam," which damaged the price of Skycoin Tokens as well as its reputation. *Id.* ¶ 62. In an apparent attempt to takeover the company, Stephens told Skycoin's advisory board that Smietana ordered him to have the article published.

On June 12, 2018, Stephens, Gevirtz, and Eagle arranged for Yan Xiandong, Li Min, Sam Sing Fond, and Sun Fei (the "Assailants") to kidnap Smietana and his girlfriend and to steal the $30,000,000 Skycoin had refused to pay. The Assailants invaded Smietana's home and

"violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets." *Id.* ¶ 73. Smietana eventually provided the passwords to his computer and the Assailants stole Bitcoin worth $139,160.33 and Skycoin worth $81,018.98. The Assailants called Stephens and complained that they did not find "the thousands of Bitcoin promised to them." *Id.* ¶ 75. On October 18, 2018, Stephens and Gevirtz demanded over $150,000 before they would return Skycoin's "computer-based assets and media accounts," which the Assailants stole. *Id.* ¶ 70.

II.    **Skycoin Delisted from Binance and Bittrex**

In February 2018, Skycoin was poised to be added to a major cryptocurrency exchange called Bittrex. Knowing this, on February 25, 2018, Stephens told Smietana that unless he paid him, Gevirtz, and Eagle $30,000,000 in Bitcoin as well as $1,000,000 in U.S. Dollars, Stephens would approach Bittrex to stop Skycoin from being listed on its exchange. After Smietana refused to pay, Stephens "provided untrue information to Bittrex" leading to Bittrex not listing Skycoin on its exchange. *Id.* ¶ 68.

On May 24, 2018, Binance, another major cryptocurrency exchange, announced that it would list Skycoin on its exchange. But because Smietana continued to refuse to pay Stephens' extortion demand, in June 2020 Stephens and Kunstman, along with the help of others, devised a plan to get Skycoin removed from Binance and to destroy Skycoin's reputation as well as the market value of Skycoin Tokens. Stephens arranged for various people to make false complaints about Skycoin. The false complaints included that "Skycoin sells Skycoin Tokens [to] customers outside of the Binance exchange but after receiving the funds, never sends those customers the Skycoin Tokens," "individuals from Skycoin would privately meet with customers and accept

6

payment for Skycoin Tokens at 15% below market value," "[a]fter customers consummated such side transactions, they would immediately 'dump' the Skycoin Tokens on the market," "Smietana would request that customers privately pay him $1,000,000 in Bitcoin or cash for discounted Skycoin Tokens that they could then 'dump' on the market immediately and achieve a $150,000 profit," and "Smietana and Skycoin launder[] money through customers by promising them an immediate 15%-20% profit through the unauthorized purchase of Skycoin Tokens." *Id.* ¶ 107. Stephens and Kunstman hired people, including Cuthriell, to complain to Binance that Smietana used drugs and engaged in other criminal conduct. As a result of this campaign against Skycoin, Binance removed Skycoin from its exchange. Following the removal, Cuthriell told everyone involved in the delisting "[n]ice work team," and "PARTY TIME." *Id.* ¶ 110.

## III.    FAM

In 2019, Stephens, Gevirtz, Kunstman, and Ogle agreed to defraud Skycoin. The group arranged for Skycoin's Wikipedia page to be deleted. Before the account was deleted, the members of the group messaged Smietana offering a "Wikipedia Protection Package" for $180,000 per year. When he refused, the Wikipedia page was deleted. Ogle then approached Smietana to pitch his marketing services and stated that he could have the Wikipedia page restored if Skycoin retained FAM.

On May 19, 2019, Smietana, not knowing that Ogle had a relationship with Stephens, Gevirtz, or Kunstman, orally agreed to retain FAM to provide advertising services on behalf of Skycoin and Symbolic. Between May 2019 and October 2019, Skycoin paid FAM for services that FAM never provided, including: $15,000 in Bitcoin for advertising services; $16,000 in Bitcoin for marketing in magazines and online publications; $10,000 in Bitcoin for Facebook

advertising; $41,000 in Bitcoin for advice on marketing in China; and $40,000 in Bitcoin for bus stop advertising. On July 10, 2019, Skycoin also paid FAM $5,000 in Bitcoin for two press releases. FAM represented that the press releases were part of its "premium" package and that Ogle would use his personal connections to provide circulation of the press releases in "higher tier media outlets." *Id.* ¶ 102. Rather than using his personal connections, as he had represented, Ogle used a commercial distribution service, which was not the service to which Skycoin had agreed.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(2) challenges the Court's jurisdiction over a party. Fed. R. Civ. P. 12(b)(2). When a defendant raises a Rule 12(b)(2) challenge, "the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (citation omitted). If the Court rules on the Rule 12(b)(2) motion without an evidentiary hearing, as here, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Id.* at 392–93; *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). In resolving a Rule 12(b)(2) motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint," *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012), and "reads the complaint liberally with every inference drawn in favor of [the] plaintiff," *GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009). However, if the defendant submits "evidence opposing the district court's exercise of personal jurisdiction, the plaintiff[ ] must similarly submit affirmative evidence supporting the court's exercise of jurisdiction." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). The Court "accept[s] as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff," *GCIU-*

*Emp. Ret. Fund*, 565 F.3d at 1020 n.1, but resolves "any factual disputes in the [parties'] affidavits in favor of the plaintiff," *Felland*, 682 F.3d at 672.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted). Rule 9(b) does not govern only claims of fraud; it applies to all allegations and averments of fraud. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Borsellino*, 477 F.3d at 507.

9

# ANALYSIS

## I.     FAM's Motion to Dismiss

FAM moves to dismiss Plaintiffs' claims against it pursuant to Rule 12(b)(2), arguing

that it does not have sufficient contacts with Illinois to subject it to this Court's jurisdiction.

Initially, FAM argues that because the Court granted Plaintiffs limited discovery regarding

jurisdiction, that Plaintiffs must establish personal jurisdiction by a preponderance of the

evidence rather than simply establishing a *prima facie* case.  But FAM cites no authority for its

position that allowing limited discovery without holding an evidentiary hearing alters the

standard.  Here, the Court did not hold an evidentiary hearing and thus Plaintiffs need only

establish a *prima facie* case of personal jurisdiction at this time.  *See Hyatt Int'l Corp. v. Coco*,

302 F.3d 707, 713 (7th Cir. 2002) ("Until [an evidentiary] hearing takes place, the party asserting

personal jurisdiction need only make out a *prima facie* case of personal jurisdiction.").

In federal question cases, the Court may exercise personal jurisdiction over a defendant

only if "federal law or the law of the state in which the court sits authorizes service of process to

that defendant."  *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assoc. of Hous. Metroplex,*

*P.A.*, 623 F.3d 440, 443 (7th Cir. 2010).  Neither the DTSA nor Illinois state law authorize

nationwide service and the DTSA is the only federal statute under which Plaintiffs bring a claim

against FAM.  Thus, FAM is "amenable to service (and hence subject to personal jurisdiction)

only if it could be served in Illinois under Illinois law."  *Id.*  Illinois allows for personal

jurisdiction to the full extent authorized by the Illinois and United States Constitutions.  *KM*

*Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 732 (7th Cir. 2013).  Although there may

be theoretical differences between the federal and Illinois constitutional standards, the Seventh

Circuit has observed that "no Illinois case has provided a definitive explanation" of these

differences." *Matlin*, 921 F.3d at 705. Moreover, both constitutional standards essentially focus on whether exercising jurisdiction over a defendant is fair and reasonable. *See KM Enters.*, 725 F.3d at 732. Thus, a single inquiry into whether the United States Constitution permits jurisdiction suffices. *See, e.g.*, *Curry*, 949 F.3d at 393 (citation omitted); *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 756–57 (7ᵗʰ Cir. 2010); *see also Wesly v. Nat'l Hemophilia Found.*, 2020 IL App (3d) 170569, ¶ 16 ("[I]t is generally true that, when federal due process concerns regarding personal jurisdiction are satisfied, so are Illinois due process concerns." (alteration in original) (citation omitted)). Jurisdiction is proper under the Due Process Clause of the United States Constitution if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Millikin v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts exist where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Brook v. McCormley*, 873 F.3d 549, 552 (7ᵗʰ Cir. 2017).

Personal jurisdiction comes in two forms: general and specific. *See Daimler AG v. Bauman*, 571 U.S. 117, 126–28 (2014); *Lexington Ins. Co. v. Hotai Ins. Co.*, 938 F.3d 874, 878 (7ᵗʰ Cir. 2019). Plaintiffs do not contend that the Court has general jurisdiction over FAM, so the Court limits its analysis accordingly. Specific jurisdiction arises "when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chi.*, 623 F.3d at 444; *see also Abelesz v. OTP Bank*, 692 F.3d 638, 654 (7ᵗʰ Cir. 2012) ("Specific jurisdiction is jurisdiction over a specific claim based on the defendant's contacts with the forum that gave rise to or are closely connected to the claim

itself.").  For purposes of specific jurisdiction, "[t]he relevant contacts are those that center on the relations among the defendant, the forum, and the litigation."  *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800–01 (7th Cir. 2014).  The Court thus considers whether FAM engaged in: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 702–03 (7th Cir. 2010).

Along with its motion, FAM submitted a declaration stating that: FAM is a Wyoming LLC, Doc. 54-2 ¶ 3, with its principal place of business in New York, New York, *id.* ¶ 5; its registered agent is in Sheridan, Wyoming, *id.* ¶ 6; FAM does not have any offices in Illinois, none of its members live in Illinois, it does not employ anyone in Illinois, it has not contracted for services in Illinois, it does not advertise in Illinois, it has never contracted to perform services for a company based in Illinois, and it does not engage in any business in Illinois or specifically directed at Illinois, *id.* ¶ 7; and all of FAM's contacts with Plaintiffs were through Smietana while he was in China, *id.* ¶ 9.  Plaintiffs do not put forward any evidence to contradict these facts, and so the Court accepts them as true for purposes of this motion.

Rather, Plaintiffs argue that FAM, acting through Ogle, who is a New York citizen, had sufficient minimum contacts with Illinois to provide the Court with personal jurisdiction for each of its claims.  There is no "'pendant' or 'supplemental' theory of specific personal jurisdiction," and so "personal jurisdiction over the defendant must be established as to each claim asserted." *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 164 F. Supp. 3d 1040, 1048–49 (N.D. Ill. 2016) (rejecting plaintiffs' attempts to establish personal jurisdiction over defendants by invoking similarities between defendants' conduct

12

against other plaintiffs that established specific jurisdiction and defendants' conduct against other plaintiffs that was related to conduct that created personal jurisdiction); *see also Zivitz v. Greenburg*, No. 98 C 5350, 1999 WL 984397, at *7 n.3 (N.D. Ill. Oct. 25, 1999) (common claims against multiple defendants could only proceed where personal jurisdiction existed independently for each claim over each defendant).

First, Plaintiffs argue that the Court has personal jurisdiction at least over their civil conspiracy claim against FAM because "[u]nder Illinois law, a conspiracy claim allows for personal jurisdiction against non-resident defendants who did not themselves commit a tort in Illinois, but conspired with others to do so." *Lakeview Tech., Inc. v. Vision Sols., Inc.*, No. 05 C 7209, 2007 WL 79246, at *9 (N.D. Ill. Jan. 9, 2007). Here, Plaintiffs allege that in 2019, Ogle conspired with Stephens, an Illinois defendant, and Gevirtz and Kunstman, non-Illinois defendants, to defraud Skycoin by arranging for Skycoin's Wikipedia page to be deleted and then having Ogle pitch FAM's services to Skycoin while concealing his relationship with Stephens, Gevirtz, and Kunstman. But while Plaintiffs allege that FAM conspired with Stephens and the others to commit a tort, they do not allege that FAM conspired with anyone to commit a tort *in Illinois*, or that FAM's conduct was expressly aimed at Illinois. *Cf. Lakeview Tech.*, 2007 WL 79246, at *9 (finding defendants can be subject to personal jurisdiction when they "did not themselves commit a tort *in Illinois*, but conspired with others to do so" (emphasis added)); *Mobile Anesthesiologists Chi.*, 623 F.3d at 445 ("[A] defendant's intentional tort creates the requisite minimum contacts with a state only when the defendant expressly aims its actions at the state with the knowledge that they would cause harm to the plaintiff there."). Plaintiffs do not allege that Skycoin or Symbolic, two foreign corporations, or Smietana, an individual whose state of citizenship is not alleged, were harmed in Illinois, that Ogle, or any other co-conspirator,

directed any conduct at Illinois, or that Ogle even knew Stephens was in Illinois.  Therefore, Plaintiffs have not sufficiently alleged the Court's personal jurisdiction over FAM regarding the civil conspiracy claim.

Second, as to the remaining claims, Plaintiffs simply argue that because Ogle had a "considerable number of dealings with Illinois based Defendants," he has purposefully availed himself of the laws and courts of Illinois.  Doc. 73 at 5.  But while "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties," "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (a defendant must "be haled into court in a forum State based on his own affiliation with the State, not based on the 'random fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985))).  Here, FAM's only connection to Illinois is Ogle's interaction with Stephens as discussed above. Plaintiffs, therefore, have failed to adequately allege that this Court has personal jurisdiction over FAM with respect to the non-conspiracy claims.

The Court thus finds that Plaintiffs have not established FAM's sufficient minimum contacts with Illinois and the Court grants FAM's motion to dismiss Plaintiffs' claims against it pursuant to Rule 12(b)(2).[5]

---

[5] Plaintiffs request that the Court grant them leave to depose Ogle to "determine the foundation and veracity of his declared statements."  Doc. 73 at 10–11.  Because Plaintiffs have not established a *prima facie* case for personal jurisdiction over FAM, even after the Court granted Plaintiffs limited written discovery, the Court denies Plaintiffs' motion.  *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) ("At a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted.").  If, however, discovery indicates that FAM actually had contacts with Illinois so as to subject it to personal jurisdiction, Plaintiffs are free to seek leave to amend their complaint to add back in their claims against FAM.

## II.        Stephens, Byerly, and Eagle's Motions to Dismiss

In their second amended complaint, Plaintiffs bring only two federal claims, for violation of RICO and DTSA, as well as a number of state law claims.  Plaintiffs contend that that the Court has original jurisdiction over the federal claims and supplemental jurisdiction over the state law claims.  Because Stephens, Byerly, and Eagle move to dismiss the claims on which the Court's original jurisdiction is based, the Court addresses these claims first.

### A.        Civil RICO Claim Against Stephens (Count I)

For their civil RICO claim, Plaintiffs allege that Stephens, but not Byerly or Eagle, belonged to an enterprise whose purpose was to obtain money from Plaintiffs and to harm Skycoin and Symbolic.  RICO "provides a civil cause of action for private plaintiffs" who have been "injured 'by reason of' a defendant's RICO violation."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 456 (2006) (citation omitted); *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019).  To state a claim for a violation of Section 1962(c), Plaintiffs must sufficiently plead conduct of an enterprise through a pattern of racketeering activity.  *Menzies*, 943 F.3d at 336.  Plaintiffs must also allege that their injuries arise "by reason of" the Section 1962 violation, requiring both "but for" and proximate causation.  18 U.S.C. § 1964(c); *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011).  Stephens argues that Plaintiffs fail to adequately allege an enterprise or a pattern of racketeering activity.[6]

---

[6] Stephens also argues that Symbolic, and not Skycoin or Smietana, is the only party bringing this claim, meaning that Stephens' alleged actions against Skycoin and Smietana cannot be considered as part of the RICO claim.  *See* Doc. 59 at 25 (listing only Symbolic in the conclusion paragraph for the RICO claim).  Plaintiffs disagree and argue that they have asserted their RICO claim on behalf of all Plaintiffs.  The substance of the allegations confirms that Plaintiffs bring this claim on behalf of all Plaintiffs.  *See id.* ¶ 115 ("Defendants have conspired to commit a years-long and ongoing pattern of racketeering . . . *against Plaintiffs*." (emphasis added)); *id.* ¶ 116 ("Defendants' association has been ongoing for years for the purpose of obtaining money from and trying to destroy [Symbolic] and Skycoin."); *id.* ¶ 117 ("The Enterprise engaged in a four-year campaign of harassment, fraud, extortion, and violent threats against Plaintiffs Smietana, [Symbolic], and Skycoin.").  That Skycoin and Smietana

### 1. Enterprise

An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise "must have an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchial [sic] or consensual decision making." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000) (citation omitted). In other words, it "must be more than a group of people who get together to commit a 'pattern of racketeering activity.'" *United States v. Neapolitan*, 791 F.2d 489, 499–500 (7th Cir. 1986). Under RICO, "enterprise" is broadly construed. *See Boyle v. United States*, 556 U.S. 938, 944 (2009) (explaining "enterprise" has "a wide reach" and "the very concept of an association in fact is expansive."). Stephens argues that Plaintiffs' allegations are conclusory and merely use "the word enterprise with no factual basis for any of the speculative, conclusory, self serving allegations." Doc. 53 at 4. The Court disagrees and finds that Plaintiffs have adequately alleged an enterprise.

In *Boyle*, the Supreme Court explained that to allege an association-in-fact enterprise, plaintiff must allege "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946. "The enterprise also must have 'a structure and goals separate from the predicate acts themselves.'" *Fund Recovery Servs., LLC v. RBC Cap. Mkts., LLC*, No. 20 C 5730, 2022 WL 142404, at *10 (N.D. Ill. Jan. 17, 2022) (quoting *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991)).

---

are not listed in the conclusion paragraph does not defeat their RICO claims because they need only have pleaded facts, not legal theories, in their complaint to place Stephens on notice of their claim. *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (citing *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 742 (7th Cir. 2010)).

Here, Plaintiffs allege that the alleged enterprise: (1) "operated as a full-time 'marketing operation' as a method of generating income and paying a salary for its members," Doc. 59 ¶ 122; (2) "included up to eight persons who were full-time staff, up to 50 persons recruited on a 'per task' basis for specific operations, and dedicated IT managers for operation of 'bot nets' of hundreds of computer accounts used against Skycoin and Smietana in extortion threats," *id.* ¶ 120; and (3) "received money to fund a full-time harassment and extortion operation," *id.* ¶ 118.  Plaintiffs allege that the enterprise had a common purpose of extorting them and ruining their business.  Plaintiffs thus allege the necessary structure and purpose to establish an enterprise.  *Stachon*, 229 F.3d at 675; *see U.S. v. Rogers*, 89 F.3d 1326, 1336–37 (7th Cir. 1996) (enterprise need not have a purpose separate and apart from the racketeering activity).

### 2.      Pattern of Racketeering Activity

The "pattern" requirement "was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes."  *Lipin Enters. Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986).  "A pattern requires the commission of at least two predicate acts of racketeering activity occurring within ten years of each other."  *DeGuelle*, 664 F.3d at 199.

### a.      Racketeering Activity

Plaintiffs contend that Stephens engaged in racketeering activity through extortion and violence in violation of the Hobbs Act, 18 U.S.C. § 1951, and by committing wire fraud in violation of 18 U.S.C. § 1343.  *U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1266 n.5 (7th Cir. 1990) (racketeering activity includes "any act which is indictable under . . . 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1951 (interference with commerce, robbery or extortion)").

17

For wire fraud, Plaintiffs must allege: (1) "the defendant's participation in a scheme to defraud;" (2) the defendant's use of interstate wires "in furtherance of the scheme;" and (3) the "defendant's commission of the act with intent to defraud." *Bible v. United States Aid Funds, Inc.*, 799 F.3d 633, 657 (7th Cir. 2015) (citation omitted). Stephens argues that the second amended complaint merely "mentions fraud through wire transactions" but does not provide "the who, what[,] when, where, and how" to properly allege wire fraud. Doc. 53 at 3; *see* Fed. R. Civ. P. 9(b) (requiring plaintiff to "state with particularity the circumstances constituting fraud"); *see also Menzies*, 943 F.3d at 338 ("[W]here, as here, a plaintiff seeks to plead RICO's pattern element through predicate acts of mail or wire fraud . . . the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply and require a plaintiff to do more than allege fraud generally."). The Court agrees.

Plaintiffs allege that the enterprise "devised a plan to defraud Plaintiffs out of money through the Marketing Program," that they "used interstate wire communications" as part of the scheme "as evidenced by numerous text, internet, social media, and email messages," and that they "implemented the fake Marketing Program . . . with the intent to defraud Plaintiffs." Doc. 59 ¶ 129A–D. But the general allegation that "interstate wire communications were used" does not meet the strict pleading requirements of Rule 9(b). *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) ("[L]oose references to mailings and telephone calls in furtherance of a purported scheme to defraud will not do. Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." (internal quotation marks and citations omitted)); *see also Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 599 (7th Cir. 2001) (to allege wire fraud as a RICO predicate "plaintiff must allege the identity of the person who made the representation, the time,

place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff"). Plaintiffs have not alleged wire fraud with the requisite specificity to meet Rule 9(b)'s heightened standard.

But Plaintiffs also allege that the enterprise violated the Hobbs Act. To state a claim for extortion under the Hobbs Act, a plaintiff must allege that defendant "obtained property from the plaintiff with consent induced by 'wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Goddess & Baker Wacker L.L.C. v. Sterling Bay Cos.*, 592 F. Supp. 3d 746, 757 (N.D. Ill. 2022) (quoting 18 U.S.C. § 1951(b)). "Exploiting a plaintiff's fear of economic loss is a basis for liability under § 1951(b) . . . And when the alleged extortion preys upon an existing fear (such as fear of business failure), 'a defendant can be liable under the Hobbs Act for the wrongful exploitation of [that] fear . . . even if there is no explicit threat.'" *Id.* (quoting *United States v. Orlando*, 819 F.3d 1016, 1024 (7th Cir. 2016)).

Stephens argues only that Plaintiffs "include[] several allegations which are classic threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, which are insufficient to state a claim." Doc. 53 at 3. But contrary to Stephens' assertion, Plaintiffs provide many specific allegations of Hobbs Act violations. For instance, Plaintiffs allege that members of the enterprise "beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours" to steal technology, cryptocurrency, and Skycoin accounts. Doc. 59 ¶ 73. Through the use of violence, they allegedly stole cryptocurrency worth $220,179.31. *Id.* ¶ 74. Plaintiffs also allege various instances in which members of the enterprise threatened harm to Plaintiffs' businesses if they were not paid and exploited Plaintiffs' fear of economic loss. *See, e.g.*, Doc. 59 ¶ 51 ("Gevirtz made statements to Skycoin's IT staff suggesting that he controlled the computers performing the SEO attacks and that they could be

19

stopped and the links damaging Skycoin's website could be removed, if Plaintiffs paid them the money demanded."); *id.* ¶ 53 (Defendants "threatened to have Skycoin delisted from all exchanges including, for example, Bittrex and Binance, unless Smietana agreed to pay them $30,000,000.00 in Bitcoin and $1,000,000.00 in U.S. Dollars"); *id.* ¶ 57 ("Smietana, in fear of Defendants Stephens's and Gevirtz's threats of financial destabilization of Skycoin, capitulated to their demands, and initiated the first of three (3) extortion payments"). Here, the enterprise not only preyed on Smietana's fear but went as far as acting on its threats by, for instance, arranging for Skycoin to be delisted from Bittrex and Binance. *See Goddess & Baker*, 592 F. Supp. 3d at 757 (finding Hobbs Act predicate where defendant preyed on plaintiff's fear of losing its business). Thus, Plaintiffs have adequately alleged racketeering activity based on Hobbs Act violations.[7]

### b.    Continuity

To show a pattern, Plaintiffs must also satisfy the "continuity plus relationship" test: they must identify predicate acts of racketeering activity that are "related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (citation omitted); *see also Menzies*, 943 F.3d at 337. Stephens argues that Plaintiffs have failed to adequately allege the continuity prong because "[a] threat of continuity cannot be based on bald assertions," and "plaintiffs cannot rely on an unsupported assertion that criminal activity will continue in the future." Doc. 53 at 3.

Plaintiffs argue that they can show continuity through the "open-ended continuity pleading requirement." Doc. 71 at 4. The open-ended continuity inquiry "focuses not on what

---

[7] Plaintiffs also allege violation of the DTSA as a predicate act. But for the reasons described later in this opinion, the Court finds that Plaintiffs have failed to state a claim for violation of the DTSA, and thus the Court does not address here whether violation of the DTSA constitutes a predicate act.

acts occurred in the past but on whether a concrete threat remains for the conduct to continue moving forward." *Menzies*, 943 F.3d at 337.  A plaintiff can demonstrate this threat in one of three ways: "by showing that a defendant's actions pose a specific threat of repetition; that the predicate acts form part of the defendant's ongoing and regular way of doing business; or that the defendant operates a long-term association for criminal purposes." *Id.*  Plaintiffs argue that a specific threat of repetition exists because they allege that the racketeering activities "are still on-going, indicating the existence of current and future harm." Doc. 71 at 4; *see also* Doc. 59 ¶ 127 ("These acts of attempted, or successful, racketeering were multiple, consistently performed by the same persons, and occurred continuously for nearly four years, and are still on-going.").  But beyond their conclusory allegation that the conduct is "still on-going," Plaintiffs do not allege any reason to believe there is a specific threat of repetition.  Doc. 59 ¶ 127; *see Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 783 (7th Cir. 1994) ("A threat of continuity cannot be found from bald assertions").

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), in discussing open-ended continuity, the Supreme Court provided an example of "a hoodlum" selling "'insurance' to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the 'premium' that would continue their 'coverage.'" *Id.* at 242.  In that example there was a specific threat of repetition because the "hoodlum" stated he would be "reappearing each month" and intimated that if the storekeepers did not pay, he would break their windows.  *Id.*  But here there is nothing inherent in the enterprise's conduct showing a specific threat of repetition.  Although the enterprise allegedly extorted Plaintiffs on multiple occasions, unlike the example in *H.J.*, they did not threaten to, for instance, perform an SEO attack on Skycoin's website every month if Plaintiffs

21

did not pay their extortion demand.  *See Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016) ("Continuity limits RICO to schemes meant to exist over a period of time, not one-off crimes.").  Further, the alleged scheme has a natural ending point—the destruction of Skycoin or the payment of the extortion demands.  *See id.* at 829 ("We have repeatedly held that schemes fail to satisfy the open-ended continuity where they have a 'natural ending point.'"); *see also Vicom*, 20 F.3d at 783 (no open-ended continuity because fraudulent scheme to inflate company's value had a natural ending point, the sale of the company); *Menzies*, 943 F.3d at 343 (plaintiff must allege "a threat of repetition extending indefinitely into the future" (internal quotation marks and citations omitted)).

Plaintiffs also allege that the enterprise meets the open-ended continuity requirement because this "is the regular way the Defendants and the Enterprise do business and will not stop without judicial intervention."  Doc. 59 ¶ 132.  But because Plaintiffs do not allege that the enterprise conducted business with anyone other than Plaintiffs, let alone that they used similar tactics, this cannot support the continuity requirement.  *See, e.g.*, *James Streibich Revocable Tr. of 2002 v. Flagstad*, No. 20 CV 2242, 2021 WL 1546439, at *8 (N.D. Ill. Apr. 20, 2021) (no continuity where plaintiff alleged only that "there were likely numerous other 'investor' victims" despite defendant defrauding plaintiff continuously over 19-month period).

The Court, therefore, finds that Plaintiffs failed to adequately allege a pattern of racketeering activity and grants Stephens' motion to dismiss the RICO claim.

## B.      DTSA Claim (Count VIII)

The DTSA, 18 U.S.C. § 1836, creates a private cause of action for "an owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  To state a DTSA

claim, Plaintiffs must allege that "(1) there are trade secrets (2) that Defendants misappropriated." *Aon plc v. Infinite Equity, Inc.*, No. 19-cv-07504, 2021 WL 4034068, at *12 (N.D. Ill. Sept. 3, 2021).

### 1. Existence of a Trade Secret

Defendants Stephens, Eagle, and Byerly argue that Plaintiffs have not adequately alleged the existence of a trade secret. The DTSA defines a trade secret as business-related information that the owner of which has taken reasonable measures to keep secret and from which the owner derives economic value from the information not being generally known or readily ascertainable by others who could gain an economic advantage from the information. 18 U.S.C. § 1839(3).

For a DTSA claim to survive a motion to dismiss, a complaint need only identify the alleged trade secret in a general sense. *See, e.g.*, *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *3 (N.D. Ill. July 31, 2017) (allegation that the defendant "was exposed to confidential information such as customer account information, product summaries, pricing sheets, product prototypes, product designs, and detailed sales reports" sufficed at the pleading stage). "Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means." *Von Holdt v. A-1 Tool Corp.*, No. 04 C 04123, 2013 WL 53986, at *11 (N.D. Ill. Jan. 3, 2013). Ultimately, a plaintiff "must prove that the real value of the information lies in the fact that it is not generally known to others who could benefit from using it." *Id.*

Plaintiffs allege that their trade secrets include proprietary "hardware and software that worked in conjunction with each other to provide customers with the ability to use and 'mine' Skycoins, while also allowing customers to make initial coin offerings" as well as confidential

source code.  Doc. 59 ¶¶ 216–17.  "Computer software may constitute trade secrets and may be entitled to trade secret protection where the owner has taken appropriate steps to protect the secrecy of the information."  *Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2005 WL 743083, at *12 (N.D. Ill. Mar. 31, 2005); *see also NEXT Payment Sols., Inc. v. CLEAResults Consulting, Inc.*, No. 17 C 8829, 2018 WL 3637356, at *13 (N.D. Ill. July 31, 2018) (finding computer software was a trade secret where it was confidential and plaintiffs "derived economic value from [its software] not being generally known or accessible").  But "[i]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated."  *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992).  While "trade secrets need not be disclosed in detail in a complaint alleging misappropriation," Plaintiffs must do more than merely allege "hardware and software" or "source code" in general.  *See AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 920–21 (N.D. Ill. 2001) (citation omitted) (internal quotation marks omitted); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definitions.").  In *AutoMed*, the court found that plaintiff adequately alleged a trade secret where it specified the software and source code that constituted trade secrets.  *AutoMed*, 160 F. Supp. 2d at 921; *see also NEXT Payments*, 2018 WL 3637356, at *13 (same).  But here, Plaintiffs only allege that their trade secrets include "hardware and software" and "source code," without alleging which pieces of hardware, software, or source code it alleges constitute trade secrets.  This is insufficient to put Stephens, Byerly, or Eagle on notice of what trade secret they allegedly misappropriated.

24

Because Plaintiffs have not adequately alleged the existence of a trade secret, the Court grants Stephens', Byerly's, and Eagle's motions to dismiss the DTSA claim. If Plaintiffs choose to amend their complaint, they should identify which pieces of software, hardware, or source code it alleges constitute a trade secret.

## III.    Supplemental State Law Claims

Plaintiffs also bring numerous state law claims against Stephens, Byerly, and Eagle, over which they contend the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. But because the Court dismisses the DTSA and RICO claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims at this time. *See* 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). The Court therefore dismiss the state law claims against Stephens, Byerly, and Eagle without prejudice and defers consideration of their arguments for dismissal of these claims until Plaintiffs adequately allege a basis for the Court's subject matter jurisdiction.[8]

### CONCLUSION

For the foregoing reasons, the Court grants Stephens', Byerly's, and Eagle's motions to dismiss [51, 53]. The Court dismisses the second amended complaint without prejudice and defers consideration of the state law claims until Plaintiffs plead a sufficient basis for subject matter jurisdiction. Further, because Plaintiffs have not alleged that FAM had sufficient contacts with Illinois, the Court does not have jurisdiction over FAM and grants FAM's motion to dismiss

---

[8] Although the Court dismisses Plaintiffs' federal claims as to these defendants without prejudice, allowing Plaintiffs to file a third amended complaint, the Court encourages Plaintiffs to carefully consider the arguments Stephens, Byerly, and Eagle made for dismissal of the state law claims and address any potential pleading deficiencies related to the state law claims in its third amended complaint.

[54]. Because the dismissal is without prejudice, the Court grants Plaintiffs until June 30, 2023 to file a third amended complaint.

Dated: May 30, 2023

_____
SARA L. ELLIS
United States District Judge