UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRANDON SMIETANA and SKYCOIN GLOBAL FOUNDATION LIMITED, a Singapore company, and SYMBOLIC ANALYTICS INC. a Delaware Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> BRADFORD STEPHENS, et al., <br><br> Defendants. | No. 22 C 708 <br><br> Judge Sara L. Ellis |

# OPINION AND ORDER

Plaintiffs Brandon Smietana, Skycoin Global Foundation Limited ("Skycoin"), and Symbolic Analytics Inc. ("Symbolic") bring federal and state law claims arising from a sordid tale of cryptocurrency scams, business betrayals, bot networks, online harassment, and physical extortion at the hands of Bitcoin-for-hire mercenaries. They filed their third amended complaint after the Court granted Defendants Far Ahead Marketing, LLC's ("FAM"), Bradford Stephens', Ryan Eagle's, and Catherine Byerly's motions to dismiss Plaintiffs' second amended complaint.[1] *See* Doc. 95. Plaintiffs bring substantially similar claims—with additional factual allegations— against all Defendants, except FAM, as they did in their previous complaint.[2] With respect to

---

[1] The Court dismissed without prejudice Plaintiffs claims against FAM for lack of personal jurisdiction. *See* Doc. 95 at 10–14. Plaintiffs did not attempt to reinstate FAM as a Defendant in their third amended complaint. *See* Doc. 100.

[2] Plaintiffs' efforts to serve all Defendants in this case have not been fruitful. As of the date of this Opinion, Plaintiffs still have not provided proof of service or affidavits of service with respect to Defendants Aaron Kunstman, Harrison Gevirtz, Morgan Peck, Steven Leonard, or Joshua Ogle despite this Court's authorization of alternative service over eight months ago. *See* Doc. 96. Defendant Joel Wayne Cuthriell filed answers to Plaintiffs' original complaint and second amended complaint, *see* Docs. 12, 50, but he has not filed a responsive pleading to their third amended complaint (and there is no indication that Plaintiffs have served him with their most recent filing). Plaintiffs filed an affidavit of

the properly served Defendants, Plaintiffs replead their claims against Stephens, Eagle, and Byerly, for misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b); tortious interference with Skycoin's business; civil conspiracy; and unjust enrichment. Plaintiffs also replead their claims against Stephens for violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961; breach of contract; and violation of the Illinois Hate Crime Act ("IHCA"), 720 Ill. Comp. Stat. 5/12-7.1. Additionally, Plaintiffs maintain their claims for fraud against Stephens and Byerly. Finally, Plaintiffs bring a claim for breach of fiduciary duty against Stephens and Byerly. Defendants Stephens, Eagle, and Byerly have each moved to dismiss Plaintiffs' third amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[3] Because Plaintiffs once again failed to plausibly allege violations of RICO and the DTSA, the Court dismisses these claims with prejudice and relinquishes supplemental jurisdiction over Plaintiffs' state law claims.

---

service indicating that they served their second amended complaint on American Publishers, Inc.'s ("API") agent for service of process on November 30, 2022, *see* Doc. 93, but API has not appeared in this case nor have Plaintiffs filed an affidavit indicating that they served API with their third amended complaint.

[3] To the extent the arguments raised by Stephens, Eagle, and Byerly apply equally to the non-appearing defendants, the Court extends its decision to include all defendants because Plaintiffs had an adequate opportunity to respond to the arguments. *See Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 2011) (court may *sua sponte* enter judgment in favor of additional non-moving defendants if motion by one defendant is equally effective in barring claim against other defendants and plaintiff had adequate opportunity to respond to the motion); *Roberts v. Cendent Mortg. Corp.*, No. 11 C 1438, 2013 WL 2467996, at *5 (S.D. Ind. June 7, 2013) (although the defendants had not entered appearances and it was not clear if they had been served, court could impute arguments made by one defendant to all defendants and dismiss claims against all of them).

## BACKGROUND[4]

In 2013, Skycoin introduced a cryptocurrency called the "Skycoin Token." Smietana is the Chief Software Architect and authorized representative of Skycoin and Symbolic. Skycoin created 100 million Skycoin Tokens, which cryptocurrency owners traded on various cryptocurrency exchanges. Aside from its cryptocurrency, Skycoin developed hardware technology that Plaintiffs describe as "hardware wallets and hardware wallet casings" that "included designs [sic] for printed circuit boards (PCBs), development kits, testing rigs for quality and to verify functionality of the PCB boards, proprietary molds for injection molding of the hardware wallet cases, PCB test rigs for flashing microcontrollers, and software for the operation of the crypto-currency wallets." *Id.* ¶¶ 223–24. Skycoin also owns secret software, which Plaintiffs describe as performing "methods of conducting coin sales, cyber security, and for production of audit trails," and which attempts to solve the "issues of theft" that frequently arise in the cryptocurrency industry. *Id.* ¶¶ 227–29. In January 2018, Skycoin Token reached its peak market capitalization at $5 billion.

**I.   Extortion, Fraud, and Interference with Skycoin's Business**

On January 8, 2018, Plaintiffs engaged Stephens and Gevirtz to provide marketing services for Skycoin. Seeing an opportunity, Stephens and Gevirtz devised a plan to defraud, extort, and steal money and assets from Skycoin with the assistance of the other Defendants. Stephens represented himself as the owner of a marketing startup company called Smolder LLC. Unbeknownst to Plaintiffs, in 2014, the Federal Trade Commission ("FTC") obtained an order preventing Stephens and Gevirtz from engaging in certain marketing activity. Stephens and

---

[4] The Court takes the facts in the background section from Plaintiffs' third amended complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving the motions to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

Gevirtz knew about the order but failed to inform Plaintiffs about it. Stephens and Gevirtz instead agreed to provide Plaintiffs with marketing services that violated the FTC's order. Pursuant to this agreement, Plaintiffs made several payments to Stephens and Gevirtz, including an initial payment of $107,948 for the marketing services, $800,000 in Skycoin Tokens for an internet advertising campaign, $14,752.44 for work that Byerly performed, $38,000 to combat a third-party attack on Skycoin's website, $14,314 for Stephens and Gevirtz to attend a conference, and payments of $842,400, $121,337, $23,212, $80,929, $56,457, and $14,679 for various other marketing services.

During their relationship with Skycoin, Stephens, Gevirtz, and Byerly sought reimbursement for unauthorized charges unrelated to legitimate business activity. On one occasion, Stephens submitted an invoice for $50,000 for cash withdrawals that he made in Las Vegas. However, Stephens refused to provide receipts and could not explain how he had spent the money. Stephens, Gevirtz, and Byerly also all submitted bills for subcontractors for dates both before and after their relationship with Skycoin, as well as for subcontractors that did not exist. Stephens, Gevirtz, and Byerly each submitted bills for nonexistent costs or unapproved expenses and falsely represented to Skycoin that they had received prior approval.

Skycoin later learned that Stephens and Gevirtz were defrauding it. For instance, on January 12, 2018, Stephens and Byerly told Plaintiffs that an unknown third-party was attacking Skycoin by posting links to pornographic content on its website as an attempt to divert traffic from the website. Stephens and Gevirtz claimed that they needed an additional $38,000 to combat these attacks, which Skycoin paid. In February 2018, however, Skycoin learned that there had been no third-party attack. In fact, it was actually Stephens and Gevirtz themselves

4

that instigated the attack so that Skycoin would pay them more money. The attack damaged Skycoin's search engine optimization ranking and significantly reduced traffic to its website.

From late January through early February 2018, Stephens demanded that Skycoin pay him $100,000 per month to combat third-party attacks, eventually increasing his demand to $300,000 per month. In early February 2018, Symbolic received invoices that it deemed "highly suggestive of fraud" and discontinued future payments to Stephens and Gevirtz. Doc. 100 ¶ 51. On February 8, 2018, Gevirtz told Skycoin's IT staff that he controlled the third-party attacks and that he could stop the attacks if Plaintiffs paid him the money he demanded. Plaintiffs did not pay the demands.

After Plaintiffs refused to pay Stephens according to his demands, Stephens, Gevirtz, and Smietana met in Shanghai, China in February 2018. Eagle attending this meeting via Zoom. During the meeting, Stephens, Gevirtz, and Eagle threatened to have Skycoin delisted from all cryptocurrency exchanges and to drive the price of Skycoin Tokens to $0 unless Smietana paid them $30,000,000 in Bitcoin as well as $1,000,000 in U.S. Dollars. Gevirtz also alluded to having connections to "organized crime cartels in Eastern Europe that would employ 'unconventional debt collection' methods should Smietana not accede to their demands." *Id.* ¶ 59. Stephens and Gevirtz also demanded that Plaintiffs name Stephens as Chief Operating Officer and name Gevirtz as Chief Financial Officer of Skycoin. On February 9, 2018, in fear of the threats, Skycoin paid $127,000 to Stephens and Gevirtz. On February 22, 2018, after pressure from Skycoin's advisory board, Stephens and the other Defendants stopped providing marketing services for Skycoin. Plaintiffs requested a refund of any not yet spent prepayments they made for the marketing services, but Stephens and Gevirtz refused.

Stephens and Gevritz also attempted to take over Skycoin through nefarious means that same month. For instance, Stephens paid journalist Tristian Greene to publish an article titled "Skycoin: Anatomy of a cryptocurrency scam," which damaged the price of Skycoin Tokens and harmed the company's reputation. *Id.* ¶ 63. In an apparent attempt to takeover the company, Stephens told Skycoin's advisory board that Smietana ordered him to have the article published.

On June 12, 2018, Stephens, Gevirtz, and Eagle arranged for Yan Xiandong, Li Min, Sam Sing Fond, and Sun Fei (the "Assailants") to kidnap Smietana and his girlfriend and to steal the $30,000,000 in Bitcoin that Skycoin had refused to pay. The Assailants invaded Smietana's home and "violently beat and tortured Smietana and his pregnant girlfriend for approximately six (6) hours in order to gain access to Smietana's computer systems, Skycoin's source code, Skycoin intellectual property, company accounts for operation of business, and cryptocurrency wallets." *Id.* ¶ 74. Smietana eventually provided the passwords to his computer and the Assailants stole Bitcoin worth $139,160.33 and Skycoin worth $81,018.98. The Assailants called Stephens and complained that they did not find "the thousands of Bitcoin promised to them." *Id.* ¶ 76. On October 18, 2018, Stephens and Gevirtz demanded over $150,000 before they would return Skycoin's "computer-based assets and media accounts," which the Assailants stole during their attack. *Id.* ¶ 71.

As part of their campaign to extort Plaintiffs and throughout its duration, Plaintiffs allege that Defendants "created thousands of fake bot accounts used to message online users" to "spread disinformation to ruin the Company's reputation." Doc. 100 ¶ 123. They also "attempted to redirect Skycoin's user base to various scam and theft websites" including "'Earn Money on Your Crypto' schemes" that mirrored scams that the FTC previously condemned. *Id.* ¶¶ 124–25. Plaintiffs further allege that Defendants "[e]ngaged in social media schemes by

impersonating [Skycoin] and announcing fictitious sales to millions of followers; [a]nnounced through impersonating social media accounts, that Skycoins will be sold at $0.02, eight cents under the current market price; [c]reated numerous impersonating company accounts and engaged in price manipulation and spread disinformation; [m]essaged people for the purpose of harassment under fake social medial accounts impersonating Plaintiff Smietana; [d]irectly messaged Plaintiff Smietana and threatened the safety of his family unless he drops the current lawsuit against Defendants; [s]tated to third parties that '[Plaintiff Smietana] is going to pay for this'; [c]reated social media accounts on Twitter and falsely posted that Plaintiff Smietana has been arrested; [s]ent numerous hate messages to Plaintiffs regarding payback, such as 'Good luck with your payback homo'; [c]ontinuously created bot accounts that message randomized users attacking the Company and spread disinformation; and [c]ontacted multiple third parties, through the impersonation of others, with threats of harm or engagement in further legal action shall they provide testimony in the current lawsuit." *Id.* ¶¶ 132(A)–(J).

## II.     Bittrex and Binance Block Skycoin

In February 2018, Skycoin was poised to be added to a major cryptocurrency exchange called Bittrex. Knowing this, on February 25, 2018, Stephens told Smietana that unless he paid him, Gevirtz, and Eagle $30,000,000 in Bitcoin as well as $1,000,000 in U.S. Dollars, Stephens would approach Bittrex to stop Skycoin from being listed on its exchange. After Smietana refused to pay, Stephens "provided untrue information to Bittrex" leading to Bittrex not listing Skycoin on its exchange. *Id.* ¶ 68.

On May 24, 2018, Binance, another major cryptocurrency exchange, added Skycoin to the list of cryptocurrencies users could trade on its platform. But because Smietana continued to refuse to pay Stephens' extortion demand, in June 2020 Stephens and Kunstman—who helped

7

operate a network of accounts under the name "Sudo" on Telegram, which is a communications platform that cryptocurrency investors frequently use to discuss the industry—along with the help of others, devised a plan to get Skycoin removed from Binance and to destroy Skycoin's reputation as well as the market value of Skycoin Tokens. Stephens arranged for various people to make false complaints about Skycoin. The false complaints included charges that "Skycoin sells Skycoin Tokens [to] customers outside of the Binance exchange but after receiving the funds, never sends those customers the Skycoin Tokens," "individuals from Skycoin would privately meet with customers and accept payment for Skycoin Tokens at 15% below market value," "[a]fter customers consummated such side transactions, they would immediately 'dump' the Skycoin Tokens on the market," "Smietana would request that customers privately pay him $1,000,000 in Bitcoin or cash for discounted Skycoin Tokens that they could then 'dump' on the market immediately and achieve a $150,000 profit," and "Smietana and Skycoin launder[] money through customers by promising them an immediate 15%–20% profit through the unauthorized purchase of Skycoin Tokens." *Id.* ¶ 108(A)–(E). Stephens and Kunstman hired people, including Cuthriell, to complain to Binance that Smietana used drugs and engaged in other criminal conduct. As a result of Stephens', Kuntsman's, and Cuthriell's campaign against Skycoin, Binance removed Skycoin from its exchange. Following Skycoin's delisting, Cuthriell told everyone involved in the removal, "Nice work team," and declared that it was "PARTY TIME." *Id.* ¶ 111.

### III. Procedural History

Plaintiffs filed their original complaint on February 8, 2022, and filed their first amended complaint on August 18, 2023. Plaintiffs then filed their second amended complaint on September 20, 2022, which they subsequently amended on October 19, 2022, in order to name

8

API in lieu of Condé Nast d/b/a The New Yorker and The New Yorker. The Court then considered Defendants Stephens', Eagle's, Byerly's, and FAM's motions to dismiss. *See* Doc. 95. First, the Court granted FAM's motion to dismiss because the company did not have sufficient minimum contacts with Illinois, depriving the Court of personal jurisdiction. *See id.* at 10–14. Next, the Court granted Stephens' motion to dismiss the RICO claim Plaintiffs brought against him because they failed to sufficiently allege that he engaged in a continuing pattern of racketeering activity. *See id.* at 20–22. The Court also granted Stephens', Eagle's, and Byerly's motions to dismiss Plaintiffs' DTSA claim because Plaintiffs did not allege with sufficient detail the existence of a trade secret. *See id.* at 22–25. Because the Court dismissed all of Plaintiffs' federal claims, it declined to exercise supplemental jurisdiction over their state law claims. *See id.* at 25. These dismissals were all without prejudice. The Court gave Plaintiffs leave to file a third amended complaint, which they filed on July 8, 2023.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the

9

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.     Federal Claims

#### A.     Civil RICO Claim (Count I)

To bring a RICO claim, "Plaintiffs must sufficiently plead conduct of [1] an enterprise [2] through a pattern of [3] racketeering activity." *Id.* (citing *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019)). In its prior decision, the Court found that Plaintiffs successfully pleaded the existence of an enterprise, *see id.* at 16–17, and racketeering activity, *see id.* at 17–20, but failed to adequately plead the "continuity plus relationship" test that would demonstrate the necessary pattern for their claim to survive, *see id.* at 20–22 (quoting *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007)). Stephens now argues that the third amended complaint fails on all three prongs of RICO's *prima facie* case. Because Plaintiffs only added factual allegations with respect to their RICO claim, *compare* Doc. 59 ¶¶ 111–36 (alleging facts relevant to RICO claim), *with* Doc. 100 ¶¶ 112–41 (alleging similar and additional facts relevant to RICO claim), the Court adopts its previous reasoning and maintains its holding that Plaintiffs successfully pleaded both the enterprise and racketeering activity requirements of a RICO claim. *See* Doc. 95 at 16–20. Its analysis thus solely focuses on whether Plaintiffs successfully plead a pattern of racketeering activity.

To show a pattern, Plaintiffs must satisfy the "continuity plus relationship" test: they must identify predicate acts of racketeering activity that are "related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Jennings*, 495 F.3d at 473 (citation omitted). "'Continuity' is both a closed- and open-ended

10

concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). Plaintiffs do not argue that Stephens' racketeering activity constituted close-ended continuity, so the Court focuses solely on the open-ended continuity analysis.

The open-ended continuity inquiry "focuses not on what acts occurred in the past but on whether a concrete threat remains for the conduct to continue moving forward." *Menzies*, 943 F.3d at 337. The Seventh Circuit has identified three scenarios where the open-ended continuity requirement is satisfied: "when (1) 'a specific threat of repetition' exists, (2) 'the predicates are a regular way of conducting [an] ongoing legitimate business,' or (3) 'the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.'" *Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 782 (7th Cir. 1994) (quoting *H.J. Inc.*, 492 U.S. at 242–43). However, if the ultimate goal of the racketeering enterprise has a "natural ending point," then it definitionally cannot have open-ended continuity. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 829 (7th Cir. 2016) (overturning jury verdict of RICO liability when facts showed "one *quid pro quo* agreement to exchange one campaign contribution for [the former Illinois governor's] signature on one bill"); *see also Gamboa v. Velez*, 457 F.3d 703, 708 (7th Cir. 2006) (affirming dismissal on pleadings that an alleged scheme to frame a murder suspect did not satisfy continuity because it was "a one-time endeavor to wreak havoc upon all matters linked to a single murder investigation" that "had a built-in end point: once the frame-up was put to rest, the scheme was over"); *Vicom, Inc.*, 20 F.3d at 783 (affirming dismissal on pleadings based on lack of open-ended continuity because the fraudulent scheme to inflate the company's value in the eyes of prospective purchaser "had a natural ending point" with the company's sale); *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d

11

918, 919–920, 922 (7th Cir. 1992) (affirming dismissal on pleadings when no open-ended continuity existed because scheme not to pay for software project had a "natural end point: the completion of the [project]").

Here, Plaintiffs argue that the four-year duration of Stephens' extortion of Plaintiffs combined with their additional allegations of Defendants' misconduct, *see* Doc. 100 ¶¶ 132(A)–(J), show that the racketeering activity plausibly had open-ended continuity. But these allegations still fail to avoid the scheme's "natural ending point—the destruction of Skycoin or the payment of the extortion demands." Doc. 95 at 22 (citing *Balmoral Racing Club, Inc.*, 831 F.3d at 829; *Vicom*, 20 F.3d at 783; and *Menzies*, 943 F.3d at 343); *see also* Doc. 100 ¶ 128 ("The persons so engaged in this enterprise openly and publicly admitted that their objective was to 'Destroy Skycoin' and to drive the price of Skycoin Token to zero."). Without allegations that Stephens' conduct would have continued even after he achieved these goals, or allegations that Stephens engaged in similar extortionary behavior against other parties, *see, e.g.*, *James Streibich Revocable Tr. of 2002 v. Flagstad*, No. 20 C 2242, 2021 WL 1546439, at *8 (N.D. Ill. Apr. 20, 2021) (no continuity where plaintiff alleged only that "there were likely numerous other 'investor' victims" despite defendant defrauding plaintiff continuously over nineteen-month period), Plaintiffs cannot demonstrate that the racketeering enterprise engaged in a pattern of conduct and the Court must dismiss their RICO claim. Because the Court already afforded Plaintiffs the opportunity to replead this claim, the Court dismisses the RICO claim with prejudice. *See Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008) ("[A] district court may deny a motion to amend 'if the proposed amendment fails to cure the deficiencies in the original pleading, or could not survive a second motion to dismiss[.]'" (quoting *Crestview Vill. Apartments v. U.S. Dep't of Hous. & Urban Dev.*, 383 F.3d 552, 558 (7th Cir. 2004))).

B.  **DTSA Claim (Count VIII)**

The DTSA, 18 U.S.C. § 1836, creates a private right of action for "an owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To state a DTSA claim, Plaintiffs must allege that "(1) there are trade secrets (2) that Defendants misappropriated." *Aon plc v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 WL 4034068, at *12 (N.D. Ill. Sept. 3, 2021).

1.  **Existence of a Trade Secret**

A trade secret consists of (1) business-related information, (2) that the owner has taken reasonable means to keep secret, and (3) that generates economic value through its secrecy. *See* 18 U.S.C. § 1839(3). Trade secret "allegations [are] adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms." *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (collecting cases); *see Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *3 (N.D. Ill. July 31, 2017) (allegation that the defendant "was exposed to confidential information such as customer account information, product summaries, pricing sheets, product prototypes, product designs, and detailed sales reports" sufficed at the pleading stage). But the "general terms" pleading standard does not give plaintiffs license to allege the existence of a trade secret in a conclusory manner: "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992).

In its previous decision, the Court found that Plaintiffs' DTSA claim failed because Plaintiffs' allegations that Defendants stole "proprietary 'hardware and software that worked in

13

conjunction with each other to provide customers with the ability to use and mine Skycoins, while also allowing customers to make initial coin offerings' as well as confidential source code" were too generic to claim that a trade secret existed. Doc. 95 at 23–24 (quoting Doc. 59 ¶¶ 216–17). In their third amended complaint, Plaintiffs add several allegations that they argue suffice to show the existence of a trade secret:

- "Plaintiffs' trade secret hardware comprised of hardware wallets and hardware wallet casings." Doc. 100 ¶ 223.

- "The trade secret hardware wallets and wallet casings included designs [sic] for printed circuit boards (PCBs), development kits, testing rigs for quality and to verify functionality of the PCB boards, proprietary molds for injection molding of the hardware wallet cases, PCB test rigs for flashing microcontrollers, and software for the operation of the crypto-currency wallets." *Id.* ¶ 224.

- "Plaintiffs' trade secret software comprised of a software process for custodial wallets and methods of conducting coin sales, cyber security, and for production of audit trails." *Id.* ¶ 227.

- "Plaintiffs' trade secret software created a solution for [the] issue [of theft prevalent in the cryptocurrency world] with coin ICOs, which are used for accounting, managing the collection of funds, and preventing the theft of funds by employees and contractors." *Id.* ¶ 229.

Defendants argue that these allegations simply reuse industry terms and state in conclusory fashion that they constitute trade secrets. The Court disagrees. Plaintiffs describe the function of the hardware, as well as its design elements and function. *Id.* ¶¶ 223–24. They similarly share in generic terms what tasks the software performs as well as the industry problems it attempts to solve. *Id.* ¶¶ 227–29. These descriptions clear the relatively low bar a party must clear to "describe[] [their trade secret] in general terms." *Berry*, 15 F. Supp. 3d at 818; *see AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 920–21 (N.D. Ill. 2001) (specifying

14

names of software programs and designation of "source code" as a trade secret suffice to survive motion to dismiss).

However, Plaintiffs fail to sufficiently allege that they took reasonable means to maintain secrecy over the hardware and software. They allege that "[t]he hardware designs were proprietary and only known to Skycoin officers" and that "only Plaintiffs' principal, Brandon Smietana, was privy to each and every trade secret and their collective uses." Doc. 100 ¶¶ 230, 237. These allegations show that their trade secrets were indeed secrets, but they do not describe the "efforts to maintain the confidentiality of the information [even] in general terms." *Scan Top Enter. Co. v. Winplus N. Am., Inc.*, No. 14 C 7505, 2015 WL 4945240, at *3 (N.D. Ill. Aug. 19, 2015). It is true that "[w]hether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury," *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003), but Plaintiffs must allege that they took such measures in the first place, *see, e.g.*, *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 180 (7th Cir. 1991) (alleging physical and contractual precautions "to maintain the confidentiality of" secrets suffice to survive motion to dismiss); *Cmty. Hosp. Partners, LLC v. Marshfield Clinic Health Sys., Inc.*, No. 22 C 234, 2023 WL 2424788, at *4 (W.D. Wis. Mar. 9, 2023) (denying motion to dismiss when plaintiff alleged "use of nondisclosure agreements"); *Puroon, Inc. v. Midwest Photographic Res. Center, Inc.*, No. 16 C 7811, 2018 WL 5776334, at *6 (N.D. Ill. Nov. 2, 2018) (denying motion for summary judgment when plaintiff provided access to trade secret only after defendant signed nondisclosure agreement ("NDA")); *see generally* Doc. 100 (containing no allegations regarding a NDA, physical measures, or other cybersecurity measures to maintain secrecy of trade information). Without these allegations, Plaintiffs do not have a viable DTSA claim. *See Berry*,

15 F. Supp. 3d at 818 (requiring allegations of secrecy to maintain DTSA action).  Because the Court already afforded Plaintiffs the opportunity to replead this claim, this dismissal is with prejudice.  *See DeLuca*, 545 F.3d at 584.

## II. Supplemental State Law Claims

Because the Court dismisses the DTSA and RICO claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.[5]  *See* 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").  The Court therefore dismisses the state law claims against all Defendants without prejudice.  Plaintiffs may bring these claims in the appropriate state venue.

## CONCLUSION

The Court grants Defendants' motions to dismiss [103], [104], [105].  The Court dismisses Plaintiffs' RICO and DTSA claims.  The Court relinquishes supplemental jurisdiction over Plaintiffs' state law claims, dismisses them without prejudice, and terminates this case.


Dated: March 5, 2024

SARA L. ELLIS
United States District Judge

---

[5] Plaintiffs make a threadbare allegation in their third amended complaint that this Court has diversity jurisdiction under 28 U.S.C. § 1332.  *See* Doc. 100 ¶ 10.  However, the parties' most recent joint status report, which they filed before Plaintiffs filed their third amended complaint, indicates that at least one plaintiff and at least one defendant are both Illinois citizens.  *See* Doc. 60 at 4–5 (noting Plaintiff Smietana's and Defendants Stephens' and Eagle's respective Illinois citizenships).  The Court thus does not have diversity jurisdiction, which requires, among other things, that *all* plaintiffs be of diverse citizenship from *all* defendants.  *See* 28 U.S.C. § 1332.